UNITED STATES FOOTBALL LEAGUE, Arizona Outlaws, Baltimore Stars Football Associates, Birmingham Stallions, Ltd., Chicago USFL Limited Partnership, Chicago Football Franchise Limited Partnership, Denver Gold Sports, Inc., Houston Gamblers Ltd., IMI Express, Inc., Jax Professionals, Inc., LAEFC, Ltd., Memphis Showboats, Ltd., Football Generals, Inc., Bay Area Football Partners Ltd., Breakers Limited Partnership, South Texas Sports, Inc., and Orlando Football Partners, Inc., Plaintiffs–Appellants, Cross–Appellees,

v.

NATIONAL FOOTBALL LEAGUE, the Five Smiths, Inc., Indianapolis Colts, Inc., Buffalo Bills, Inc., Chicago Bears Football Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns, Inc., Dallas Cowboys Football Club, Inc., Rocky Mountain Empire Sports, Inc., the Detroit Lions, Inc., Green Bay Packers, Inc., Houston Oilers Inc., Los Angeles Rams Football Company, Minnesota Vikings Football Club, Inc., New England Patriots Football Club, Inc., New Orleans Saints Louisiana Partnership, New York Football Giants, Inc., New York Jets Football Club Inc., the Philadelphia Eagles Football Club, Pittsburgh Steelers Sports, Inc., St. Louis Football Cardinals Co., Chargers Football Company, San Francisco Forty-Niners, Ltd., Tampa Bay Area NFL Football, Inc., Pro–Football Inc., Kansas City Chiefs Football Club, Inc., Miami Dolphins, Ltd., Seattle Professional Football and Alvin R. Rozelle, individually and as Commissioner of the National Football League, Defendants–Appellees, Cross–Appellants.

Nos. 1189, 1430, Dockets 87–7137, 87–7271.

United States Court of Appeals, Second Circuit.

Argued June 22, 1987.

Decided March 10, 1988.

---

Harvey D. Myerson, New York City (Lloyd S. Clareman, Arthur H. Ruegger, Mark E. Segall, Daniel J. Cooper, Douglas R. Pappas, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, New York City, of counsel), for plaintiffs-appellants, cross-appellees.

Frank Rothman, and Robert B. Fiske, Jr., New York City (William H. Mulligan, Barry H. Garfinkel, Shepard Goldfein, Douglas B. Adler, Seth B. Schafler, Michael H. Roffer, Deborah A. Garza, Skadden, Arps, Slate, Meagher & Flom, and L. Gordon Harriss, Robert M. Buschmann, Davis Polk & Wardwell, New York City, John Vanderstar, Paul J. Tagliabue, L. Jeffrey Pash, Covington & Burling, Washington, D.C., of counsel), for defendants-appellees, cross-appellants.

Before CARDAMONE, PIERCE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This appeal follows a highly publicized trial and jury verdict of $1.00. The plaintiff is a now-defunct professional football league that began play in this decade; the defendant is a football league founded nearly seventy years ago. The older of the two leagues, the National Football League, is a highly successful entertainment product. So many Americans watched NFL games between 1982 and 1986 that its twenty-eight teams shared $2.1 billion in rights fees from the three major television networks, and perhaps as much as $1 billion in gate receipts. The newer league, the United States Football League, began play in March 1983 with twelve teams and network and cable television contracts with the American Broadcasting Company ("ABC") and the Entertainment and Sports Programming Network ("ESPN"). After three seasons and losses in the neighborhood of $200 million, the USFL played its last game in July 1985. Meanwhile, in October, 1984, blaming its older competitor for its difficulties, the USFL instituted this litigation. Plans to play in the fall of 1986 were abandoned after the jury's verdict that is the principal subject of this appeal.

The USFL and certain of its member clubs [1] brought this suit in the Southern District of New York against the NFL, its

---

1. The Tampa Bay franchise withdrew as a plaintiff at the time of the filing of the First Amended Complaint. The Arizona Outlaws have withdrawn their appeal.

commissioner, Alvin R. "Pete" Rozelle, and twenty-seven of its twenty-eight member clubs.[2] Seeking damages of $1.701 billion[3] and appropriate injunctive relief, the USFL alleged that the NFL violated Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2 (1982), and the common law. Forty-eight days of trial before Judge Leisure produced a trial transcript of nearly 7100 pages and thousands of additional pages in exhibits.

After five days of deliberations, the jury found that the NFL had willfully acquired or maintained monopoly power in a market consisting of major-league professional football in the United States. The jury also found that the NFL's unlawful monopolization of professional football had injured the USFL.[4] The jury awarded the USFL only $1.00 in damages, however, an amount that, even when trebled, was no consolation for the USFL.

The jury rejected the remainder of the USFL's claims. It found that the NFL had neither monopolized a relevant television submarket nor attempted to do so; that the NFL did not commit any overt act in furtherance of a conspiracy to monopolize; that the NFL did not engage in a conspiracy in restraint of trade; that the NFL's television contracts were not unreasonable restraints of trade; that the NFL did not control access to the three major television networks; and that the NFL did not interfere either with the USFL's ability to obtain a fall television contract or with its spring television contracts. The USFL's common law claims were also rejected.

Judge Leisure denied the USFL's motions for judgment notwithstanding the verdict on its claims of monopolization of the television submarket, attempted monopolization, unreasonable restraint of trade by means of the network television contracts and essential facilities, and for a new trial on damages on the monopolization of professional football claim, or in the alternative for a new trial. *United States Football League v. National Football League*, 644 F.Supp. 1040 (S.D.N.Y.1986) (*"Opinion No. 16"*). The district court also denied the USFL's request for injunctive relief.

On this appeal, the USFL claims that a "litany of erroneous opinions, rulings and instructions" by Judge Leisure resulted in a "verdict of confusion" that "sent one of the most egregious violators in the history of the federal antitrust laws on its way with a pat on the back." USFL Br. at 3-4. Specifically, the USFL contends that the NFL could not legally enter into a pooled-rights agreement with all three networks; that Judge Leisure's jury instructions "destroyed" the effectiveness of the USFL's proof of its television claims and set improperly high standards of liability; that he improperly allowed the NFL to introduce evidence that the USFL was mismanaged; that he excluded other evidence critical to establishing the USFL's claims; and that his incorrect rulings and instructions on damages prevented the USFL from receiving appropriate relief. We affirm.

## SUMMARY

We briefly summarize our principal rulings. The jury's finding of illegal monopolization of a market of major-league professional football was based upon evidence of NFL attempts to co-opt USFL owners, an NFL Supplemental Draft of USFL players, an NFL roster increase, and NFL conduct directed at particular USFL franchises. These activities, however, were hardly of sufficient impact to support a large damages verdict or to justify sweeping injunctive relief. For that reason, the USFL candidly admits that "at the heart of this case" are its claims that the NFL, by con-

---

**2.** The Los Angeles Raiders, Ltd., were not named as defendants in this action.

**3.** The complaint requested that "the Court award the plaintiffs threefold the amount of actual damages, not less than $440,000,000 in the aggregate ($1,320,000,000 when trebled)"; in the joint pretrial order, plaintiffs sought "three-fold the amount of actual damages in excess of $567,000,000 in the aggregate (in excess of $1,700,000,000 when trebled)."

**4.** NFL Commissioner Rozelle was not found personally liable on the USFL's monopolization claim.

1342

tracting with the three major networks and by acting coercively toward them, prevented the USFL from acquiring a network television contract indispensable to its survival. The jury expressly rejected the television claims.

The jury was clearly entitled by the evidence to find that the NFL's fall contracts with the three networks were not an anticompetitive barrier to the USFL's bidding against the NFL to acquire a network contract. Moreover, there was ample evidence that the USFL failed because it did not make the painstaking investment and patient efforts that bring credibility, stability and public recognition to a sports league. In particular, there was evidence that the USFL abandoned its original strategy of patiently building up fan loyalty and public recognition by playing in the spring. The original plan to contain costs by adherence to team salary guidelines was discarded from the start. Faced with rising costs and some new team owners impatient for immediate parity with the NFL, the idea of spring play itself was abandoned even though network and cable contracts were available. Plans for a fall season were therefore announced, thereby making 1985 spring play a "lame-duck" season. These actions were taken in the hope of forcing a merger with the NFL through the threat of competition and this litigation. The merger strategy, however, required that USFL franchises move out of large television markets and into likely NFL expansion cities. Because these moves further eroded fan loyalty and reduced the value of USFL games to television, the USFL thereby ended by its own hand any chance of a network contract.

■ Notwithstanding the jury's evident conclusions that the USFL's product was not appealing largely for reasons of the USFL's own doing and that the networks chose freely not to purchase it, the USFL asks us to grant sweeping injunctive relief that will reward its impatience and self-destructive conduct with a fall network contract. It thus seeks through court decree the success it failed to achieve among football fans. Absent a showing of some un-

lawful harm to competition, we cannot prevent a network from showing NFL games, in the hope that the network and fans will turn to the USFL. The Sherman Act does not outlaw an industry structure simply because it prevents competitors from achieving immediate parity. This is particularly so in the case of major-league professional football because Congress authorized a merger of the two leagues existing in 1966 and thus created the industry structure in question.

THE TRIAL

1. *The Parties' Contentions*

The USFL contended at trial that the NFL maintained a monopoly in the market for major league professional football and in a submarket for the network broadcasting rights to such football by the following allegedly predatory tactics:

a. Signing multiyear contracts with the three major television networks;

b. Pressuring the major networks to abstain from televising USFL games in the spring or fall, and successfully preventing any network telecasts of the USFL in the fall, by threatening not to renew NFL contracts or by assigning unattractive NFL games under existing contracts;

c. Establishing contracts with the networks for artifically high rights fees that, because of the so-called "dilution effect" on demand for advertising during NFL games, precluded network broadcasts of the USFL;

d. Seeking to prevent any of the three major networks from signing a contract for the USFL's initial 1983 spring playing season;

e. Rotating the Super Bowl among the three networks and not submitting the Super Bowl, playoff and even regular-season television rights to competitive bidding;

f. Pursuing a strategy outlined in the so-called "Porter Presentation" to "conquer" and bankrupt the USFL, including: co-opting powerful USFL owners, such as Donald Trump and Alfred Taubman, by offering them

NFL franchises; encouraging ABC not to continue USFL broadcasts; pressuring ABC by giving it an unattractive schedule for its *Monday Night Football* program in 1984; targeting important USFL players for signing with the NFL through means such as the NFL's Supplemental Draft and expanded roster; and attempting to bankrupt the weakest USFL teams by driving up USFL player salaries in order to diminish the USFL's size and credibility;

g. Collaborating with the City of Oakland to destroy the Oakland Invaders of the USFL in order to hurt the credibility and image of the Invaders and the entire USFL;

h. Threatening to move an existing NFL franchise or to create a new NFL franchise solely to injure the USFL franchise in Oakland; and

i. Attempting to preclude the USFL's New Jersey Generals from moving to New York City.

The NFL contended that the relevant television submarket included entertainment broadcasting generally and that it had not monopolized either the market for major league professional football or the television submarket because:

a. Its contracts with the three major networks were not exclusionary;

b. The USFL's failure to secure a fall network contract was the result of the independent judgment of each network that the USFL was an inferior product, and of the USFL's self-destructive strategy of forcing a merger with the NFL;

c. It never pressured a network by threatening non-renewal or by assigning a schedule of unattractive games;

d. It never undertook the strategy outlined in the Porter Presentation;

e. It never sought to injure the USFL's Oakland franchise or to preclude the New Jersey Generals from playing in New York City; and

f. The losses suffered by the USFL were due to its own mismanagement.

### 2. The History of Major–League Professional Football

The NFL is an unincorporated association presently consisting of twenty-eight independent, for-profit football clubs. It was founded in 1920 in a Canton, Ohio Hupmobile showroom under the name American Professional Football Association. In 1922, it changed its name to the National Football League. The original teams were the Akron Pros, the Canton Bulldogs, the Cleveland Indians, the Dayton Triangles, the Decatur Staleys, the Hammond Pros, the Massillon Tigers, the Muncie Flyers, the Rock Island Independents and the Rochester Jeffersons, although Massillon and Muncie never played any games. By 1926, the NFL had grown to twenty-two franchises. By 1931, it had shrunk back to ten. The first championship game was not played until 1933. The first NFL draft of college players took place in 1935. All NFL teams played the same number of games for the first time in 1936. As late as 1952, NFL teams encountered bankruptcy. Indeed, NFL Commissioner Rozelle once testified that "41 franchises failed in the first 41 years of the League's existence." Transcript of Proceedings at 55, *United States v. National Football League*, No. 12808 (E.D.Pa. July 27, 1961).

A competing league, the All–America Football Conference ("AAFC"), was organized in 1945 and operated for four seasons with teams in Brooklyn, Buffalo, Chicago, Cleveland, Los Angeles, Miami, New York and San Francisco. *American Football League v. National Football League*, 205 F.Supp. 60, 65 (D.Md.1962) ("*AFL v. NFL*"), aff'd, 323 F.2d 124 (4th Cir.1963). Baltimore replaced Miami in 1947, and after the 1948 season, the Brooklyn team merged with the New York team. *Id.* The AAFC ceased operations in 1949 when the Baltimore, Cleveland and San Francisco teams were absorbed by the NFL, raising the number of its teams to thirteen. *Id.* Shortly thereafter, that number was reduced to twelve, where it remained until 1960. *Id.* The NFL's twelve teams were

the Baltimore Colts, Chicago Bears, Chicago (later St. Louis) Cardinals, Cleveland Browns, Detroit Lions, Green Bay Packers, Los Angeles Rams, New York Giants, Philadelphia Eagles, Pittsburgh Steelers, San Francisco Forty–Niners and Washington Redskins. *Id.* at 62. The Dallas Cowboys, Minnesota Vikings, Atlanta Falcons and New Orleans Saints were added as expansion teams in 1960, 1961, 1966 and 1967, respectively. Joint Pretrial Order at 14, ¶ 28.

The American Football League ("AFL") was founded in late 1959 by Lamar Hunt, a scion of a Texas oil family, and began play in the fall of 1960. The demand for professional football was then sufficiently great to enable the AFL to obtain a contract with ABC for the years 1960–63. The new league was fueled in part by the NFL's cautious approach toward expansion; many of the AFL's original owners had unsuccessfully sought NFL franchises, and the majority of the AFL teams were located in cities without an NFL team. *See generally AFL v. NFL*, 205 F.Supp. at 66–75. The original eight teams were the Boston Patriots, Buffalo Bills, Dallas Texans, Denver Broncos, Houston Oilers, Los Angeles (San Diego after the 1960 season) Chargers, New York Titans, and Oakland Raiders. *Id.* at 62. The Miami Dolphins joined the AFL in 1960, the Cincinnati Bengals in 1968. Joint Pretrial Order at 14, ¶ 28. The AFL brought an unsuccessful antitrust suit against the NFL in 1962. *See AFL v. NFL*, 323 F.2d 124 (4th Cir.1963), *aff'g* 205 F.Supp. 60.

In 1966, the NFL and the AFL agreed to merge, largely because the competition for players had sharply increased salaries. Congress exempted this merger from the antitrust laws by legislation discussed *infra*. The merger became fully effective when a twenty-six-team NFL began play in 1970 with two conferences, the National Football Conference and American Football Conference. The NFL reached its present size of twenty-eight teams when expansion teams began play in Seattle and Tampa in 1976.

In 1974, the World Football League ("WFL") was founded. The WFL lasted for one-and-one-half seasons before disbanding. Its teams were underfinanced and played in mostly smaller markets. The WFL never obtained a television contract with a major network, although its games were televised by a syndicated network. At least one of the league's teams tried unsuccessfully to enter the NFL through litigation. *See Mid–South Grizzlies v. National Football League*, 720 F.2d 772 (3d Cir.1983) (rejecting antitrust claim by WFL team denied admission to NFL).

The USFL was founded in May 1982 by David Dixon as a league that would play spring football. The league began play in March 1983 with teams in Birmingham, Boston, Chicago, Denver, Los Angeles, Michigan, New Jersey, Oakland, Philadelphia, Phoenix, Tampa and Washington. In part because of the location of its teams in major television markets, the USFL was able to obtain multimillion dollar network and cable television contracts with ABC and ESPN. Nevertheless, for reasons explored in detail *infra*, the USFL demonstrated little stability. Over its three seasons of spring football (one of which was a "lame-duck" season commenced after an announced decision to shift to fall play), the USFL clubs played in twenty-two cities,[5]

---

5. The USFL teams played in the following cities/states:

| 1983 | 1984 | 1985 | 1986 (proposed) |
|---|---|---|---|
| Birmingham | Birmingham | Baltimore | Baltimore |
| Boston | Chicago | Birmingham | Birmingham |
| Chicago | Denver | Denver | Jacksonville |
| Denver | Houston | Houston | Memphis |
| Los Angeles | Jacksonville | Jacksonville | New Jersey |

and had thirty-nine principal owners.[6] None of the majority owners of an original USFL team was a majority owner by 1986 when a planned fall schedule was aborted by the $1.00 verdict.

| | | | |
|---|---|---|---|
| Michigan | Los Angeles | Los Angeles | Orlando |
| New Jersey | Memphis | Memphis | Phoenix |
| Oakland | Michigan | New Jersey | Tampa |
| Philadelphia | New Jersey | Oakland | |
| Phoenix | New Orleans | Orlando | |
| Tampa | Philadelphia | Phoenix | |
| Washington, D.C. | Phoenix | Portland | |
| | Pittsburgh | San Antonio | |
| | San Antonio | Tampa | |
| | Tampa | | |
| | Tulsa | | |
| | Washington, D.C. | | |

---

6. The principal owners of USFL teams during 1983–85 were as follows:

| Team | 1983 | 1984 | 1985 |
|---|---|---|---|
| Arizona | Jim Joseph | Edward Diethrich<br>Bill Harris<br>George Allen | William Tatham, Sr. |
| Baltimore | NA | NA | Myles Tanenbaum |
| Birmingham | Marvin Warner | Marvin Warner | Marvin Warner* |
| Boston | George Matthews<br>Randy Vataha | NA | NA |
| Chicago | Edward Diethrich<br>Bill Harris<br>George Allen | James Hoffman** | Eddie Einhorn |
| Denver | Ron Blanding | Doug Spedding | Doug Spedding |
| Houston | NA | Jerry Argovitz<br>Jay Lerner<br>Alvin Lubetkin<br>Jay Roulier*** | Jerry Argovitz<br>Alvin Lubetkin<br>Jay Roulier |
| Jacksonville | NA | Fred Bullard | Fred Bullard |
| Los Angeles | Bill Daniels<br>Alan Harmon | William Oldenburg**** | |
| Memphis | NA | Logan Young<br>William Dunavent | William Dunavent |
| Michigan | Alfred Taubman<br>Max Fisher<br>Peter Spivak | Alfred Taubman<br>Max Fisher | NA |
| New Jersey | J. Walter<br>Duncan | Donald Trump | Donald Trump |
| New Orleans | NA | Joseph Canizaro | NA |
| Oakland | Tad Taube | Tad Taube | Alfred Taubman<br>Tad Taube |
| Oklahoma | NA | William Tatham, Sr. | NA |
| Orlando | NA | NA | Donald Dizney<br>Jim English<br>John Day |
| Phila. | Myles<br>Tanenbaum | Myles Tanenbaum | NA |
| Pittsburgh | NA | Edward J.<br>DeBartolo, Sr. | NA |
| Portland | NA | NA | Joseph Canizaro |
| San Antonio | NA | Clinton Manges | Clinton Manges |
| Tampa Bay | John Bassett<br>Steve Arky | John Bassett<br>Steve Arky | John Bassett<br>Steve Arky |
| Washington | Berl Bernhard<br>Bob Linowes | Berl Bernhard<br>Bob Linowes | NA |

---

* Mr. Warner surrendered his interest in the Birmingham franchise in April, 1985.

### 3. *The NFL's Television Contracts*

The growth of the NFL was closely related to the growth of television. Beginning in 1951, the Dumont network televised five regular season games (twelve by 1954), as well as the championship game each year. In the mid–1950's, the Columbia Broadcasting System ("CBS") began broadcasting certain NFL regular season games for $1.8 million per year, and the National Broadcasting Company ("NBC") acquired the right to televise the NFL championship game. The broadcast rights to games were controlled by individual teams during the 1950's, however.

In 1961, the NFL teams agreed to sell their collective television rights as a single package and to share broadcast revenues equally among all franchises. This decision was in response to arguments by Commissioner Rozelle that the league's competitive balance on the field would eventually be destroyed if teams in major television markets continued to sell their broadcast rights individually. In the long run, he believed, great differentials in television revenues among teams would lead to a competitive imbalance that would diminish the overall attractiveness of the NFL's product. *See* Transcript of Proceedings at 67–68, *United States v. National Football League*, No. 12808 (E.D.Pa. July 27, 1961) (testimony of Commissioner Rozelle); *see also United States Football League v. National Football League*, 634 F.Supp. 1155, 1161 & n. 2 (S.D.N.Y.1986) (*"Opinion No. 2 "*). Rozelle's arguments were bolstered by the policy of the recently organized AFL to pool television rights and revenues in its first broadcast contract with ABC.

Before the NFL could enter a pooled-rights television contract, however, it had to overcome several legal obstacles. An earlier attempt by the NFL to control the sale of television rights by its teams had been deemed a violation of Section 1 of the Sherman Act in *United States v. National Football League*, 116 F.Supp. 319 (E.D.Pa. 1953). In that case, the government sought to enjoin the enforcement of Article X of the NFL's by-laws, which regulated the broadcast of distant games into the home territories of other teams.[7] Applying Rule-of-Reason analysis, Judge Grim held that the restriction on the broadcast of outside games when home teams were playing away was an impermissible restraint of trade. *Id.* at 327. The Final Judgment provided that:

> The defendants are jointly and severally ... enjoined ... from directly or indirectly entering into ... any contract, agreement or understanding with the league defendant or any member club of the league defendant, ... having the purpose or effect of restricting the areas within which broadcasts or telecasts of games ... may be made.

*United States v. National Football League*, No. 12808, Final Judgment § V (E.D.Pa. Dec. 28, 1953), *quoted in Opinion No. 2*, 634 F.Supp. at 1159.

In 1961, the NFL brought a pooled-rights agreement with CBS before Judge Grim for a determination as to whether the

---

** Dr. Hoffman surrendered his interest in the Chicago franchise in January, 1984. Thereafter, it was operated by a corporation, CPHFC, Inc., until July 2, 1984, when a new franchise for Chicago was granted to Edjer Corp.

*** Mr. Roulier became a principal owner in June, 1984, replacing Mr. Lerner.

**** Mr. Oldenburg surrendered his interest in the Los Angeles franchise in June, 1984. The franchise was operated by a USFL corporation for the balance of the 1984 season. In November, 1984, a new franchise for the Los Angeles area was acquired by LAEFC, Ltd., a Colorado limited partnership. From November 1984 until January 30, 1985, Jay Roulier owned the stock of Express Football Club, Inc., the general partner of LAEFC, Ltd. As of January 30, 1985, the stock of Express Football Club, Inc. was acquired by USFL Holdings, Inc., the stock of which is wholly owned by the USFL.

7. Article X provided that "[n]o club shall cause or permit a game in which it is engaged, to be telecast or broadcast into any area included within the home territory of any other club, without the consent of such other club" on a day on which the other club was either playing or broadcasting one of its games at home. 116 F.Supp. at 329. The government contended that this provision restricted competition among clubs in the sale of broadcast rights.

agreement violated the 1953 Final Judgment. This contract provided that CBS would have the "right to determine, entirely within its own discretion ... which games shall be televised and where such games be televised." *United States v. National Football League*, 196 F.Supp. 445, 447 (E.D.Pa.1961). Judge Grim held that CBS's authority to determine when and where games would be broadcast violated Section V of the Final Judgment. *Id.* A subsequent motion by the NFL for a modification or suspension of the Final Judgment was denied. Judge Grim accordingly enjoined the execution and performance of the pooled-rights contract between the NFL and CBS, and further enjoined the NFL from entering into "any other contract and agreement having similar purpose or effect." *United States v. National Football League*, No. 12808 (E.D.Pa. July 28, 1961) (order construing 1953 Final Judgment).

Specifically intending to alter Judge Grim's order, *see* S.Rep. No. 1087, 87th Cong., 1st Sess. 1, *reprinted in* 1961 U.S. Code Cong. & Admin.News 3042, 3042, Congress enacted the Sports Broadcasting Act of 1961, which exempted from the antitrust laws pooled-rights agreements entered into by professional sports leagues. Pub.L. No. 87–331, § 1, 1961 U.S.Code Cong. & Admin.News 822, 75 Stat. 732 (codified as amended at 15 U.S.C. § 1291) (Supp. IV 1986). In order to protect college games from competition with pro football telecasts, the exemption did not apply to the broadcast of professional football games on Friday nights and Saturdays during the college football season. *Id.* § 2 (codified as amended at 15 U.S.C. § 1293 (1982)).

The first NFL pooled-rights contract was with CBS. For the 1962 and 1963 seasons,

CBS was the only network permitted to bid for this contract because it had individual rights contracts running through 1963 with nine teams. The NFL received $4,650,000 per season from CBS during these two seasons. For the 1964–65 NFL contract, CBS outbid NBC and ABC with an offer of $14,100,000 per season. In 1964, the AFL, which had had a contract with ABC, entered into a five-year, $36 million contract with NBC.

In 1966, Congress amended the Sports Broadcasting Act specifically to confer antitrust immunity on the NFL–AFL merger. Pub.L. No. 89–800, § 6(b)(1), 80 Stat. 1515 (codified as amended at 15 U.S.C. § 1291). At the same time, the restriction on Friday night and Saturday telecasts was expanded to include protection for high school football. *Id.* § 6(b)(3). In passing this legislation, Congress was plainly informed that, upon consolidation of the two leagues, the NFL would have broadcast contracts with at least two networks. *Professional Football League Merger: Hearings on S. 3817 Before Antitrust Subcomm. (Subcomm. No. 5) of the House Comm. on the Judiciary*, 89th Cong., 2d Sess. 64, 66, 119 (1966).

In 1970, the NFL entered into a contract with ABC to televise a game nationally on Monday nights. Since then, all three major television networks have broadcast NFL games,[8] and the NFL's annual revenues from television have increased by more than 800 percent. The NFL teams received approximately $186 million for the 1970–73 seasons; $268 million for the 1974–77 seasons; $646 million for the 1978–81 seasons; and $2.1 billion over the five-year period 1982–86.

The ABC, CBS and NBC contracts from 1970 onward have given each network rights of first negotiation and first refusal

---

**8.** ABC now televises Monday night games and certain prime-time games. CBS televises National Football Conference ("NFC") games throughout the season, on Thanksgiving Day, and on Saturdays in December. NBC televises American Football Conference ("AFC") games throughout the season, Thanksgiving Day, and on Saturdays in December. Interconference games are televised by the network with the rights to the conference of the visiting team.

CBS televises NFC playoff games, and NBC televises AFC playoff games. The first Super Bowl, held in 1967, was broadcast by both CBS and NBC. Since 1967, CBS and NBC have alternated telecasts of the Super Bowl, except that pursuant to its 1982–86 contract with the NFL, ABC televised the Super Bowl played in January 1985. Broadcasting rights to Super Bowl games are not bid for separately but are rotated among the networks.

to decide whether to continue its NFL contract for subsequent years. The NFL's 1982–86 contracts were nonexclusive and did not forbid a network from televising another football league's games at any time when it was not broadcasting NFL games. NBC was thus legally free to televise to a particular city another league's games on Sunday afternoons directly opposite NFL games on CBS when there was no NFL game scheduled for NBC to be televised to that city. CBS had a similar option. ABC was legally free to televise another league's games all afternoon each Sunday. All three networks were legally free to telecast another league's games in prime time. Because the NFL was forbidden by its network contracts to televise games on cable, cable television contracts were open to a competing league, although such contracts are less lucrative than network contracts. When the NFL's network contracts expired in 1981 and 1986, the networks were free to contract with a competing league's games for all time slots.

The NFL's three-network "tie-up" was a central issue at trial. The USFL claimed that the NFL intentionally set out to tie up the three networks as a means of excluding competitors. In support of its theory, the USFL introduced a memorandum from NFL general counsel Jay Moyer written during the NFL's 1973 network contract negotiations stating that "an open network may well be an open invitation to formation of a new league." Commissioner Rozelle testified, however, that in 1970, before contacting ABC and signing the Monday night football contract with it, he unsuccessfully approached CBS and NBC, both of which already televised NFL games, about their interest in prime-time football. The USFL also emphasized at trial a June 1984 CBS business study suggesting that the fall broadcast of USFL games on Sundays would reduce the network's advertising revenues from NFL games by $49 million to $53 million over three years. This "dilution effect," the USFL argued, created a $50 million barrier to entry by a new league.

The USFL also sought to show that the NFL had placed unlawful pressure on the networks to prevent the broadcast of USFL games. Much of this evidence consisted of statements by USFL representatives and hearsay and speculation by third parties.[9] Officials from the three networks and one cable network testified that the NFL had not exerted any pressure on them regarding the broadcast of USFL games.[10] Several network officials did testify, however, that they feared that televising the USFL in the fall might jeopardize their NFL relationships [11]—a fear somewhat at odds with the USFL claim that the NFL needed three network contracts to produce the "dilution effect." Executives from all three major networks also testified that by 1986, after the USFL had left several large television markets and was encountering financial and other difficulties, the USFL was not an attractive entertainment product.[12]

9. USFL Commissioner Harry Usher testified that he was told by Roone Arledge, the president of ABC Sports, that Arledge "had had negative reaction from the NFL for putting the USFL on initially." ABC sportscaster Howard Cosell testified that he was told by Arledge that Commissioner Rozelle was "all over" Arledge because ABC was televising the USFL in the spring. (Arledge testified unequivocally that he had never made such a statement to Cosell.) Jim Spence, a senior vice-president at ABC, testified that he believed that the NFL was "less than enamoured" of the network's dealings with the USFL, although he did not recall that any NFL official had directly expressed any displeasure to him.

10. For example, Jim Spence, former senior vice-president of ABC Sports; Frederick Pierce, former president of ABC; Roone Arledge, group president of ABC News and Sports, former president of ABC Sports; Neil Pilson, president CBS Sports, executive vice-president of CBS, former president of CBS Sports; Arthur Watson, president of NBC Sports; William Grimes, president of ESPN.

11. For example, CBS Sports President Neil Pilson testified that he would consider televising the USFL in the fall only if another network was involved. This double exposure would increase the USFL's value and also not leave CBS in a position that would induce the NFL to give the other networks better treatment, including a better schedule of games.

12. NBC Sports President Watson testified that his network did not conduct a business study concerning the feasibility of broadcasting USFL games on Saturday in the fall because of the

### 4. *"Conquering the USFL": Predatory Tactics*

The USFL also sought to prove monopolization by the NFL through predatory tactics unrelated to television. It thus introduced a memorandum prepared by NFL labor negotiator Jack Donlan entitled "Spending the USFL dollar," which urged NFL owners to bid for USFL players to drive up USFL costs. The USFL's proof of predatory behavior, however, consisted primarily of allegations concerning the recommendations of the so-called "Porter Presentation," and of the so-called Oakland and New York "conspiracies."

The Porter Presentation was a two-and-one-half hour presentation, entitled *USFL v. NFL*, by Harvard Business School Professor Michael Porter to sixty-five NFL executives attending a multiday seminar on labor negotiations. Porter's presentation, which was not previewed by anyone in the NFL, set out a strategy for the NFL to "conquer the USFL."

The USFL claimed that the NFL implemented a recommendation of the Porter Presentation by attempting to "co-opt" USFL owners with promises of an NFL franchise. Donald Trump, owner of the USFL's New Jersey Generals, testified that he was offered an NFL franchise by Commissioner Rozelle in exchange for his blocking the USFL's proposed move to the fall and his preventing the league from filing the instant action. Rozelle denied that he made such an offer to Trump. In addition, hearsay testimony by Al Davis, owner of the NFL's Los Angeles Raiders, a team not sued by the USFL, indicated an attempt to co-opt Alfred Taubman of the Michigan Panthers. Taubman, however, denied that he was offered an NFL team.

The USFL also claimed that the NFL followed Professor Porter's recommendation to "dissuade" ABC from continuing its USFL contract. Supporting evidence consisted largely of hearsay introduced to show the state of mind of the networks. The declarants denied making any such statements. Jim Spence of ABC did testify, however, that the NFL informed him that the NFL owners were "not enamored" with the network's USFL contract. Nevertheless, ABC subsequently offered the USFL a four-year, $175 million contract for spring football beginning in 1986. The USFL also claimed that the NFL used a method recommended by Porter to pressure ABC by offering it unattractive Monday night games that would and did earn low ratings in 1984. In response, NFL officials testified that the 1984 *Monday Night Football* schedule was settled before the Porter Presentation, that "weak" teams such as Buffalo and Cincinnati appeared on that schedule fewer times than in prior years, and that any change in ABC's ratings was due to economic conditions that affected the entire sports television marketplace.

Finally, the USFL claimed that the NFL followed Porter's recommendations for competing for players. This evidence consisted of the NFL's decision to conduct a supplemental draft of players still under USFL contract in March 1984, an increase in NFL roster size from forty-five to forty-nine, conversations between the Dallas Cowboys and USFL star Herschel Walker, and NFL salary offers to relatively unknown USFL players such as Todd Fowler.

The USFL also contended that the NFL and the City of Oakland conspired to destroy the USFL's Oakland Invaders in return for an NFL promise that Oakland would receive an NFL team. This so-called "Oakland conspiracy" was based on the testimony of Al Davis that he "sensed" that the NFL wanted to "destroy" the Invaders and on Commissioner Rozelle's public statement that Oakland, having lost the Raiders, would be considered for an NFL expansion franchise.

The "New York conspiracy" involved a claim that the NFL and the NFL's New York Jets conspired to mislead New York City and State officials into believing that the Jets were willing to return from New

---

network's commitments to other sporting events, including baseball, college basketball, golf, and thoroughbred racing.

Jersey to New York. The purpose of this conspiracy was to block the USFL's New Jersey team from moving to a new domed stadium in New York. Proof of this conspiracy consisted of testimony by Senator Alphonse D'Amato and Vincent Tese, Chairman and Chief Executive Officer of the New York State Urban Development Corporation, that Leon Hess, owner of the Jets, had promised to return his team to New York. In addition, Al Davis testified that there was an "understanding" reached at a 1983 NFL owners' meeting to keep a USFL team out of New York. Other participants in this meeting denied any such understanding or agreement.

### 5. *Damages*

The USFL's evidence of damages consisted of the testimony of economist Nina Cornell, who sought to estimate the league's losses by two methods. Method A was based on the assumption that the gate and television revenues of an unhindered USFL could be estimated by using the gate receipts and television revenues of the old AFL. Dr. Cornell estimated the USFL's damages under this method at $565 million. Method B was based on the June 1984 CBS business study examining the fall broadcast of USFL games. She estimated the USFL's damages under this method at $301 million.

Dr. Cornell's damage calculations rested on several other assumptions. First, of course, she assumed that illegal NFL conduct was the cause of the USFL's failure to obtain a network contract. Second, Dr. Cornell assumed that the NFL could lawfully contract with only one network. Third, her calculations attributed the USFL's damages entirely to illegal NFL conduct and not at all to the USFL's own mismanagement.

Finally, she assumed that there would be no increased player costs to the USFL resulting from the shift to fall play and that salaries would remain stable from 1986 to 1992. Tension existed between her assumption of stable salaries and her projections of large increases in USFL revenues as a result of playing in the fall during the 1986 to 1992 seasons. Player salaries had already increased dramatically because of the two leagues' competition for players, even when they were playing in different seasons. No reason was given to expect a stabilization of wages when the leagues would play in the same season and the USFL would have substantially greater revenues to compete for players. Moreover, a cornerstone of the USFL's television claim was that a network contract was essential so that it could compete for quality players, a position that is hardly consistent with stability in player salaries.

### 6. *Management of the USFL*

The USFL was conceived and organized in 1981 to play in the spring rather than the fall. Its founders believed that public demand for football was not satisfied by the NFL's and the colleges' fall seasons; that cable television, which could not televise NFL games under the existing NFL-network contracts, would offer unique opportunities for television revenues and exposure; that a spring football league would face limited competition; that there was a sufficient supply of football players for two leagues; and that a spring league could draft college players and put them on the field even before the NFL draft.

The USFL's founders placed a high priority on the fans' perception of the quality of play. They intended to use major stadiums [13] and to hire well-known coaches.[14]

---

13. Included were such prominent NFL stadiums as Soldier Field in Chicago (capacity 65,793); the New Orleans Superdome (72,675); Giants Stadium in New Jersey (76,891); the Houston Astrodome (47,965); the Silverdome in metropolitan Detroit (72,675); and RFK Stadium in Washington, D.C. (54,794). Before trial, Judge Leisure granted summary judgment in favor of the NFL on the USFL's stadium-related claims on *Noerr–Pennington* grounds. *United States*

*Football League v. National Football League,* 634 F.Supp. 1155, 1179–80 (S.D.N.Y.1986) (*"Opinion No. 4"*). This ruling has not been appealed.

14. A number of the USFL's coaches had coached in the NFL: George Allen (Redskins and Rams); Chuck Fairbanks (Patriots); Frank Kush (Colts); Walt Michaels (Jets); Red Miller (Broncos); and John Ralston (Bills). Several had been successful NFL players: John Hadl, Craig Morton, Jack Pardee and Steve Spurrier.

At the same time, they wanted the league to control costs. For its first season, therefore, the USFL established budget guidelines for player salaries of between $1.3 and $1.5 million per team.

The USFL's founders did not seek to obtain a television contract for fall play. Before fielding a team, however, the USFL received bids for a spring television contract from ABC and NBC and from two cable networks, ESPN and the Turner Broadcasting System. The league entered a four-year contract with ABC, and a two-year contract with ESPN. The ABC agreement provided for ABC to pay the USFL $18 million for the 1983 and 1984 seasons, with options exercisable by ABC at $14 million for 1985 and at $18 million for 1986.[15] ESPN contracted to televise USFL games for two years at rights fees of $4 million for 1983 and $7 million for 1984. The USFL began with eight of its twelve teams in the nation's top ten television markets. The ABC contract required the USFL to field teams in the three largest television markets (New York, Los Angeles and Chicago) and in at least four of the five other top-ten television markets in which teams were originally located (Philadelphia, Boston, Detroit, San Francisco/Oakland and Washington).

The USFL's first year of play, 1983, was a mixed success. The league received extensive media exposure when it signed Heisman Trophy winner Herschel Walker to a three-year, $3,250,000 contract. The Nielsen television rating for the first week of games was 14.2, a figure comparable to NFL ratings. As the season went on, however, the USFL's television ratings declined; average television ratings for the year were 6.23 on ABC and 3.28 on ESPN. Average attendance for the year was approximately 25,000. Nevertheless, these figures were consistent with the league's and networks' preseason projections.

On the financial side, the picture was not as bright. The USFL lost a total of almost $40 million, or an average of $3.3 million per team. The league had projected losses of only about $2 million per year for each team over the first three years. The unanticipated financial losses were chiefly the result of the failure to stay within the original salary guidelines. Indeed, in a November 1983 letter to other owners, Tad Taube of the Oakland team warned that: "If we are not successful in establishing player [salary] caps I can guarantee you that there will not be a USFL within three years, irrespective of improved revenue [from] television.... We have sighted the enemy and they are us!"

The USFL's second year was marked by change. Four teams shifted locations. For example, the owner of the Chicago franchise exchanged that franchise for the Phoenix franchise, taking his winning Chicago coach and players while the original Phoenix team moved to Chicago under a new owner. The league, over the objection of some owners, expanded from twelve teams to eighteen. Five of the original owners left the league. Some of the new owners, notably Donald Trump of the New Jersey Generals, believed that the USFL ought to play in the fall. Thereafter, the issue of when to play became divisive, and several owners came to believe that Trump was trying to bring about a merger with the NFL that would include only some USFL teams.[16]

The NFL introduced extensive evidence designed to prove that the USFL followed Trump's merger strategy, and that this strategy ultimately caused the USFL's downfall. The merger strategy, the NFL argued, involved escalating financial competition for players as a means of putting pressure on NFL expenses, playing in the fall to impair NFL television revenues, shifting USFL franchises out of cities

---

15. The ABC agreement provided for additional payments for the telecast of more than twenty USFL games per season as well as for the shifting of daytime telecasts into prime time.

16. After a January 1984 USFL owners' meeting, Myles Tanenbaum of the Philadelphia franchise complained that the "'Original' franchise owners" had become outnumbered, and expressed his outrage that "one of the group believes it would be fair or appropriate to simply 'pay off' others in the event there is a potential big hit by way of merger or whatever."

where NFL teams played into cities thought to be logical expansion (through merger) cities for the NFL, and, finally, bringing the antitrust litigation now before us.

Throughout the second half of 1983 and early 1984, several USFL owners escalated spending on player salaries. USFL teams, for example, signed established NFL players such as running back Joe Cribbs and defensive back Gary Barbaro. Trump, in particular, signed a number of players who were still under contract with the NFL to future contracts, including superstar Lawrence Taylor of the New York Giants. USFL owners also signed many top players coming out of college, for example, wide receiver Anthony Carter and quarterback Jim Kelly. The USFL's spending on players greatly outpaced its revenues. The owner of the Los Angeles team, for example, committed the team to $13.1 million in salaries and bonuses for just one season. He even entered into a multiyear, $40 million contract with just one player, Steve Young of Brigham Young University.

By the end of the 1984 season, USFL franchises in two of the top three television markets, Chicago and Los Angeles, had failed, and only four of the original owners remained in the league. The league was not a failure as entertainment, however. Despite a decline in the USFL's television ratings to 5.7 on ABC and 2.8 on ESPN, ABC exercised its option to carry the USFL in the spring of 1985 at $14 million and offered a new contract worth $175 million for four years in the spring beginning in 1986. ESPN offered a contract worth $70 million over three years.

Nevertheless, during an August 1984 owners' meeting, the USFL decided to move to the fall in 1986. This decision was made despite: (i) ABC's warning that such a move would breach its contract for the spring of 1985 and 1986; (ii) the contrary recommendations of a management consulting firm, McKinsey & Company, which the USFL had retained for $600,000 to consider the advisability of a fall season; and (iii) the contrary recommendations of the

USFL's directors of operations and marketing.

Moreover, Eddie Einhorn, a USFL owner who was to represent the USFL in negotiations to secure a network contract for the fall, warned that moving from large television markets to "merger" cities too quickly might preclude the securing of a network contract. Nevertheless, in the ensuing months, the USFL withdrew from Chicago, Detroit, Philadelphia, Pittsburgh and Washington, D.C.—each a large television market with an NFL team—and moved into Baltimore (which had lost its NFL team in 1984) and Orlando (which had no NFL team). Through mergers, the USFL bolstered franchises in Oakland (which had lost the NFL Raiders to Los Angeles) and Phoenix (which had been discussed as a possible NFL expansion city). The decision to move to the fall damaged the USFL's relations with ABC and ESPN. The former withheld a significant portion of the USFL's rights fees for the 1985 season, while the latter demanded a renegotiation of its proposed 1985–87 USFL contract. The following table reflects the USFL's movement from the top television markets:

| 1983 | 1984 | 1985 | 1986 (Proposed) |
|---|---|---|---|
| New York | New York | New York | New York |
| Los Angeles | Los Angeles | Los Angeles | |
| Chicago | Chicago | San Francisco/ Oakland | |
| Philadelphia | Philadelphia | | |
| San Francisco/ Oakland | San Francisco/ Oakland | | |
| Boston | Detroit | | |
| Detroit | Washington | | |
| Washington | | | |

In October 1984, the instant litigation was begun. The USFL's 1985 "lame-duck" spring season appears to have been affected adversely by the now publicly announced move to the fall. The league's television ratings declined to 4.1 on ABC and 2.0 on ESPN. By the end of the season, several owners had withdrawn financial support for their teams, and a number of clubs were no longer meeting their payrolls and other bills. The USFL scheduled eight teams for its fall 1986 season, which was ultimately cancelled after the verdict in this case. Only one team (New Jersey), was in a top-ten television market. One other team (Tampa Bay), was in a top-twen-

ty market. Three teams were located in Florida (Jacksonville, Orlando and Tampa Bay) but only one was west of the Mississippi River (Phoenix). In three years, USFL teams had left fourteen of the twenty-two cities in which they had played.

### 7. The Verdict

The jury found the NFL liable on the USFL's claim of actual monopolization, concluding that the older league had willfully acquired or maintained monopoly power in a market consisting of major league professional football in the United States (Question No. 4). The jury also found that the NFL's unlawful monopolization had caused injury to the USFL (Question No. 5). In ruling on the NFL's motion for judgment notwithstanding the verdict with respect to these findings, the district court held that sufficient evidence existed that the NFL had engaged in predatory conduct. This evidence related to: (1) NFL efforts to co-opt USFL owners and potential owners; (2) the NFL Supplemental Draft of USFL players; (3) the NFL's move to a forty-nine-man roster; and (4) the NFL's activity directed at specific USFL franchises such as the Oakland Invaders. *Opinion No. 16,* 644 F.Supp. at 1058.

The USFL was unsuccessful on its remaining claims. The jury found that none of the defendants had violated Section 2 by attempting to monopolize a relevant market (Question No. 7), or by conspiring to monopolize (Question Nos. 12–14). In addition, the jury found that even though "one or more defendants [had] participate[d] in a contract, combination or conspiracy to exclude competition within major league professional football" (Question No. 20), that combination was not an unreasonable restraint of trade in violation of Section 1 (Question No. 21). The fatal blow, however, was the complete rejection of the USFL's television claims. The jury found

that the NFL had not willfully acquired or maintained a monopoly in a relevant television submarket (Question No. 4). It further found that the NFL's contracts with all three television networks for the right to broadcast the league's regular season and championship games through the 1986–87 season were not an unreasonable restraint of trade violative of Section 1 (Question No. 24). Finally, the jury rejected the USFL's "essential facilities" claim, specifically finding that "defendants [did not] have the ability to deny actual or potential competitors access to a national broadcast television contract" (Question No. 33), although it also found that such a contract was "essential to the ability of a major league professional football league to compete successfully in the United States" (Question No. 31) and "that potential competitors of the NFL, cannot as a practical matter, duplicate the benefits of a network contract" (Question No. 32).[17]

### DISCUSSION

On appeal, the USFL raises a host of claims with respect to the NFL's liability, the district court's evidentiary rulings, damages charge, and denial of injunctive relief.

### 1. Liability

#### a. The Sports Broadcasting Act

The USFL contends that the Sports Broadcasting Act of 1961 limits the antitrust exemption for pooled-rights contracts to a single contract with one network. Therefore, it argues, the NFL's multiple contractual arrangements with three networks violates the injunction in *United States v. National Football League,* 116 F.Supp. 319 (E.D.Pa.1953), a decision claimed by the USFL collaterally to estop the NFL from denying that its arrange-

---

17. In ruling that any inconsistency in these verdicts did not require a new trial, a ruling not challenged on appeal, the district court first recognized that inconsistent verdicts in a civil case are fully permissible in this circuit. *Opinion No. 16,* 644 F.Supp. at 1045 (citing *Globus v.*

*Law Research Serv., Inc.,* 418 F.2d 1276, 1290 n. 17 (2d Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970)). The court also plausibly reconciled the actual verdicts in the instant case. *Id.* at 1046–48.

ments with the networks violate Section 1 of the Sherman Act.

> The Sports Broadcasting Act states that: The antitrust laws ... shall *not* apply to all joint agreement by or among persons engaging in or conducting the organized professional team sport[ ] of football, ... by which any league of clubs participating in professional football ... contests sells or otherwise transfers *all or any* part of the rights of such league's member clubs in the sponsored telecasting of the game[ ] of football. ...

15 U.S.C. § 1291 (emphasis added). This statutory language thus neither states nor implies that the exemption limits the NFL to a contract with only one network. *See, e.g., United States v. James*, 478 U.S. 597, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (statute foreclosing government "liability of *any* kind ... for *any* damage from or by floods" "outlines immunity in sweeping terms ... It is difficult to imagine broader language"); *United States v. Holroyd*, 732 F.2d 1122, 1124, 1128 (2d Cir.1984) (statute proscribing willful filing with IRS of "any" statement not believed to be accurate "means what it says on its face" and covers *all* statements to IRS). Moreover, the legislation does contain express limitations on the exemption designed to protect college football from televised competition with the NFL, which suggests by implication that no other limitations exist.

Faced with statutory language unambiguously hostile to its claims, the USFL resorts to alleged ambiguities in the legislative history. Upon examination, however, the legislative history offers *no reason to depart* from the statutory language. For example, NFL Commissioner Rozelle stated during the congressional hearings on the Act that if all the networks were tied up by the NFL, a competing league "would ... possibly be at a major disadvantage" and that the bill was designed to allow the NFL to televise on one network. *Telecasting of Professional Sports Contests: Hearings on H.R. 8757 Before the Antitrust Subcomm. (Subcomm. No. 5) of the House Comm. on the Judiciary*, 87th Cong., 1st Sess. 35 (1961). These remarks were made, however, during a colloquy in which Rozelle twice stated explicitly that the proposed legislation would allow the NFL to utilize all three networks. Moreover, he predicted that, although the NFL had a present intention to use only one network, in twenty years a "single network may no longer be desirable, and it may become much better for the public and the league to use more than one network." *Id.* Rozelle's testimony thus provides little comfort to the USFL.

More tellingly, the USFL also relies upon the following passage in the House Report accompanying the 1961 legislation:

> Some concern has been expressed that the language of this section might be considered to give an absolute exemption from the antitrust laws for any kind of television arrangements entered into by a league, and particularly an arrangement which might involve several networks and might thus exclude a competing league from all television coverage. This is not the intent of H.R. 9096 which is designed to permit the sale of television rights by a league and its member clubs to a single network. The committee does not intend that an exemption from the antitrust laws should be made available to a league or its members where the intent or effect of a joint agreement is to exclude a competing league or its members from the sale of any of their television rights.

H.R.Rep. No. 1178, 87th Cong., 1st Sess. 4 (1961). This language was apparently included at the suggestion of AFL Commissioner Joe Foss, who testified that the proposed legislation should guard against agreements with networks that unreasonably excluded competing leagues. *See Opinion No. 2*, 634 F.Supp. at 1162.

We believe the USFL exaggerates the import of that statement in the House Report. The report says no more than that multiple pooled-rights agreements may be the subject of a monopolization or unreasonable restraint of trade claim by a competing league. Precisely such claims were submitted to the jury in this case and rejected by it.

The Senate Report does not expressly address the issue of multiple network contracts, other than to conclude ambiguously that the public interest would be served "with minimal sacrifice of antitrust principles by exempting *joint agreements* under which a league sells or transfers pooled television rights of its members to *a purchaser*." S.Rep. No. 1087, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Admin.News 3042, 3044 (emphasis added).

In any event, the passage of the 1966 NFL–AFL merger statute provides conclusive evidence that Congress did not intend the 1961 Act to prohibit NFL contracts with more than one network. When considering this legislation, Congress was explicitly informed that the merged league would continue to broadcast its games on "at least 2 networks," [18] and no concern whatsoever was expressed in Congress that such conduct was either undesirable or would go beyond the scope of the 1961 Act's exemption. Moreover, while permitting the merger, Congress added a further limitation to the exemption to protect high school games from televised competition with the NFL. The lack of a "one network" limitation in the 1966 merger bill thus dooms the USFL's claims. Accordingly, we hold that the mere existence of the NFL contracts with the three networks does not violate the antitrust laws. Having made this determination, we need not consider whether the decree in *United States v. National Football League* has any collateral-estoppel effect.

b. The "Dilution Effect"

The USFL does not argue that there was insufficient evidence to support the jury's rejection of its claim that the NFL prevented it from obtaining a network contract. The failure to make this argument is understandable in light of the swift dismissal such a claim would encounter. However, the USFL does the next-best thing by attacking the district court's instructions regarding "intent *and* effect" and "legitimate business purpose," both discussed immediately *infra*, on grounds that these instructions led the jury to ignore an "unchallenged showing of anticompetitive effect" and "textbook example of an anticompetitive practice." Moreover, the USFL continues to seek broad injunctive relief concerning the NFL's television contracts on the ground that such relief is necessary to bring competition to the industry. Because these claims are based on the so-called "dilution effect" of the NFL's contracts with the three networks, a separate discussion of the concept of a "dilution effect" and its role in the professional football industry is necessary.

The term "dilution effect" comes from a CBS business study ordered by Neil Pilson, CBS Sports' President, and completed in June 1984. CBS conducted the study because it was apprehensive over ABC's signing a USFL fall contract and desired the leverage a second league would afford it in its negotiations with the NFL. The study estimated the economic impact on CBS of

---

**18.** During the hearings on the merger bill, Commissioner Rozelle testified "that because of the logistics of handling perhaps 13 or 14 games on a Sunday afternoon, [the NFL] would require at least 2 networks." *Professional Football League Merger: Hearings on S. 3817 Before the Antitrust Subcomm. (Subcomm. 5) of the House Comm. on the Judiciary,* 89th Cong., 2d Sess. 64 (1966). In response to the question of whether New York City residents would be able to see professional football on television when the other New York club was playing a home game, Rozelle said that the league would try to do so, "which is why I feel we will probably have to go to two networks, to assure that each of the 26 or 28 teams has all of its road games brought back to its home city." *Id.* at 66. Moreover, the NFL and AFL submitted a memorandum to the subcommittee concerning whether the merger would result in reduced broadcasts of football games:

> Because a single network cannot practicably establish as many as twenty-eight regional networks and because the expanded league desires to maintain its present level of club television income, the plan contemplates the continued *use of two networks* by the expanded league, *e.g.,* on a conference or other divisional basis. Thus, both during the period prior to the expiration of the existing television contracts and afterwards, it is contemplated that there will be continued home viewer access to duplicate broadcasts, including telecasts of other league games into home cities on days when the home team is playing at home.

*Id.* at 119 (emphasis added).

the televising of USFL games in the fall under various scenarios. One scenario posited only ABC televising USFL games on Sundays. The scenarios most pertinent to the present discussion posited CBS and either NBC or ABC televising USFL games. Under these scenarios, CBS would televise both USFL and NFL games on Sundays. The final scenario posited USFL games being televised by NBC and ABC on fall Sundays. No study was made of CBS being the only network with a USFL contract because CBS was not interested in such an arrangement. *See supra* note 11.

As explained by Pilson, the value of a USFL fall contract to CBS was determined (in simplified fashion) as follows. From the estimated gross advertising revenues would be subtracted estimates of: (i) expenses related to production; (ii) losses in revenues that would otherwise have been earned by programs preempted by USFL games, or "preemptive impact"; (iii) decreases in advertising revenues from NFL games resulting from the addition of USFL games, or "dilution effect"; and (iv) rights fees to the USFL. Pilson testified that when these estimates were made in June 1984, the resultant calculation, CBS's profit, was negative. The USFL argues that, but for the "dilution effect" of $50 million, the sum would have been sufficiently positive to make a USFL contract attractive. The USFL assumes that the "dilution effect" was experienced equally by all three networks and thus concludes that the effect of NFL's network contracts was to exclude all competition.

■ The district court instructed the jury to analyze the NFL's television contracts in light of the CBS study. Specifically, the jury was told to consider "[t]he high NFL rights fees charged to the networks, which plaintiffs allege triggered a dilution effect that makes it economically infeasible for any network to offer a satisfactory television contract to any professional football league other than the NFL." The jury rejected the USFL's claims as to the "dilution effect" in finding that the NFL had not monopolized a television submarket, that the NFL television contracts

were not an unreasonable restraint, and that the NFL did not have the power to exclude a competing league from obtaining a network contract. There was ample evidence to support these conclusions.

First, the USFL concedes, as it must, that the "dilution effect" is nonexistent when the NFL network contracts expire and negotiations over new contracts are under way. Whatever exclusionary effect exists is only for the term of the three NFL network contracts, and all leagues are free to compete on the basis of the quality of their product upon the expiration of these contracts. The district court's instructions directed the jury to consider the length of these contracts, then five years, in determining whether they were reasonable. Its verdict, therefore, is dispositive because the duration of the contracts was hardly unreasonable as a matter of law.

Second, there was no evidence that the result of the calculations described above would be the same for ABC as for CBS. ABC's contract was largely confined to televising a single NFL game in prime time on a weekday night. Its Sundays were free of football, and it would not encounter the scheduling problems faced by CBS in televising both NFL and USFL games on Sunday afternoons. ABC was thus free to schedule games so as to maximize revenue. Moreover, whatever "dilution effect" ABC's prime-time games might suffer was not necessarily identical to that faced by CBS. The jury might easily conclude, absent evidence to the contrary, that the "dilution effect" on CBS from back-to-back NFL–USFL telecasts on Sunday afternoons would be greater than on ABC, which would not broadcast NFL games on Sunday. And there was no evidence to the contrary. The USFL, which bore the burden of proof on this issue, called two witnesses from ABC in a position to testify about the "dilution effect" on ABC. Neither witness was questioned about the "dilution effect." Both did testify, however, that the USFL's exodus from major television markets and its other difficulties greatly diminished the value of USFL telecasts by 1985 and 1986.

Third, the conduct of the NFL and the networks indicates that neither believed their contracts to be exclusionary. Notwithstanding the early opinion of the NFL's Moyer about a network without a contract being an "open invitation to a new league," the NFL's actual conduct displayed no marked desire to lock up all three networks. Prime-time weekday telecasts were offered to NBC and CBS, both of whom already had NFL contracts, before ABC was approached. It was the testimony of both the ABC executives and CBS's Pilson, elicited by counsel for the USFL, that Rozelle routinely used the threat of leaving them without an NFL contract in order to extract from them the largest possible rights fees. If the "dilution effect" theory of exclusion were correct, the NFL could not credibly threaten to leave one network without a contract. If the theory were correct, moreover, the last network to sign with the NFL would have a bargaining advantage because its agreement would be essential to the NFL's monopoly, much as the owner of the last lot in a tract of land needed for a construction project can demand the highest price. In the NFL-network negotiations, the opposite was the case, and the last network to sign was at a bargaining disadvantage. Thus, in 1982, the NFL first signed agreements with ABC and NBC and then approached CBS. According to Pilson, CBS regarded itself as being in a very disadvantageous bargaining position. As a result, CBS paid $736 million for the new contract, an increase of more than 100% over its previous contract. On the basis of this evidence, therefore, the jury would have been hard-pressed to conclude that the NFL needed a contract with CBS to freeze out a competing league, a circumstance that would have precluded a credible threat to leave CBS without a contract and the resultant hefty increase in rights fees.

■ Fourth, even if the "dilution effect" theory were alive and well in 1986, the jury could have found that that "effect" was not a cause of the USFL's failure to get a network contract in that year. The CBS study was made in 1984 and was based on estimates of revenues that were plainly excessive given the circumstances of 1986. Immediately after the study was completed, the Supreme Court decided *National Collegiate Athletic Association v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), invalidating the NCAA's exclusive control over the televising of college football games. This decision had the effect of multiplying greatly the number of college games telecast and of reducing advertising revenue generally for football games. An ABC witness also testified there was a proliferation of sporting events on network and cable television after the fall of 1984 that also reduced the advertising fees that could be charged for professional football. In addition, there were the problems of the USFL itself. The league had failed to establish fan loyalty in most places because of repeated franchise moves. Most importantly, the USFL had abandoned most major television markets, thereby rendering telecasts of its games much less valuable than had been estimated by the earlier CBS study. Finally, the disagreements among the USFL owners, the financial condition of some of the franchises, and the "lame-duck" spring season of 1985 further lessened the value of USFL telecasts in 1986. In fact, Pilson himself testified that by 1986 the events described above had rendered the "dilution effect" irrelevant to CBS's decision not to televise the USFL. In light of this evidence, the jury was free to conclude that the revenues to be expected from USFL telecasts were so low that no network would purchase them even if there were no "dilution effect." [19]

19. The USFL's brief offers an extreme version of the "dilution effect," which we quote:

The NFL's television-related conduct constitutes a textbook example of an anticompetitive practice available only to one who dominates the market. In a normal, competitive market, the NFL's extraction of monopoly rents by fixing its rights fees at an artificially high level would prove pro-competitive by attracting new businesses into the market. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 [106 S.Ct. 1348, 1354, 89 L.Ed.2d 538] (1986). But by tying up the only three television networks capable of pro-

#### c. "Intent *and* Effect" Charge

We now consider the district court's instruction regarding liability on the USFL's television-related claims. The USFL contends that it should not have been required to show that the intent *and* effect of the NFL's television contracts with the major networks were exclusionary (rather than simply intent *or* effect) in order to prove a Section 2 claim. In addition, the USFL contends that the district court erred with respect to the Section 1 television instruction because it applied the intent-*and*-effect standard to the Rule-of-Reason claims. We reject both contentions.

■ The district court gave the following charge with respect to the USFL's Section 2 television-related claims:[20]

A company may not be found to have wilfully acquired or maintained monopoly power if it has acquired that power solely through the exercise of superior foresight and skill or because of natural advantages ..., or because of economic or technological efficiency; ... or by laws passed by Congress

....

In this regard, you should be aware that in 1966 Congress passed a law permitting the merger of the two major football leagues then existing....

Accordingly, I instruct you that the 1966 merger of the AFL and the NFL cannot be the basis for inferring that the NFL acquired monopoly power unlawfully.

In addition, in 1961 Congress passed a statute that provides that a contract between a professional sports league and a television network for the sale of pooled telecast rights is not a restraint of trade in violation of the antitrust laws.

Accordingly, I instruct you that the making of these contracts by the NFL with the television networks constitutes the lawful acquisition of power, [e]ven if you were to find that these contracts gave the NFL monopoly power, *unless you found that the intent and effect of these agreements is to exclude a competing league or its members from selling any of their television rights.*

(emphasis added). This instruction was consistent with the Sports Broadcasting Act, discussed *infra*, as exempting from antitrust scrutiny a league's pooled-rights contracts with networks unless they constitute illegal monopolization or an unreasonable restraint of trade so far as competing leagues are concerned. More importantly, the intent-*and*-effect charge was consistent with the legal standards for illegal monopolization under Section 2.

■ The Supreme Court has repeatedly defined monopolization as the "willful acquisition or maintenance" of monopoly power. *E.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596

---

viding the revenue to support a competing league, and increasing the actual rights fees charged each of them by 625% in less than ten years (a feat only attainable through the exercise of market power), the NFL forces the networks in turn to raise NFL advertising prices above competitive levels. This in turn creates a disincentive to televise a rival, competitively-priced football league in the fall because such a lower-priced league would drive down advertising rates and reduce the NFL viewing audience. This disincentive, termed the "dilution effect" and quantified by CBS at $50 million, applies equally to all the networks and prevents them from considering fairly the merits of a new league.
USFL Br. at 39 (footnote and citation to record omitted).
Even putting aside the unproven factual premises—the existence of monopoly rents, the identical impact of the "dilution effect" upon all networks, the quantification of $50 million as

realistic for 1986—this theory appears to posit a uniquely sadomasochistic economic relationship in which the more the seller charges, the happier the buyer is. Needless to say, the network executives who testified did not describe their negotiations with Rozelle as fitting that model. Nor was there evidence indicating why the networks had to be "forced" by high NFL rights fees to charge advertising prices the market would bear anyway.

**20.** The USFL incorrectly claims that the district court's instructions applied a more stringent standard of proof to its television claims than to other claims. In fact, the intent-*and*-effect charge was given on all the monopolization issues. The USFL also claims it was surprised by the intent-*and*-effect charge. It was aware before trial, however, that the NFL would seek such a charge. In any event, no claim of harm other than a passing psychic injury to otherwise robust counsel is made.

n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985); *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). The willfulness element certainly requires proof of intent. *See Aspen Skiing*, 472 U.S. at 602 n. 28, 105 S.Ct. at 2858 n. 28 (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 432 (2d Cir.1945) ("*Alcoa*") ("In order to fall within § 2, the monopolist must have ... the intent to monopolize.")). Proof of effect is required by definition alone to satisfy the "acquisition or maintenance" requirement.

A requirement that both intent *and* effect be proven is necessary to enable a trier of fact to make the critical distinction between conduct that defeats a competitor because of efficiency and consumer satisfaction, and conduct that "not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing*, 472 U.S. at 605 n. 32, 105 S.Ct. at 2859 n. 32 (quoting 3 P. Areeda & D. Turner, *Antitrust Law* 78 (1978)). Hopes and dreams alone cannot support a Section 2 claim of monopolization. *Berkey Photo*, 603 F.2d at 273–75. If they did, the nationwide advertisement "Ford wants to be your car company" would constitute an open-and-shut Section 2 case. Success alone is not enough or the antitrust laws would have their greatest impact on the most efficient entrepeneurs and would injure rather than protect consumers.

Proof of intent *and* effect is also of evidentiary value. Distinguishing between efficient and predatory conduct is extremely difficult because it is frequently the case that "[c]ompetitive and exclusionary conduct look alike." Easterbrook, *On Identifying Exclusionary Conduct*, 61 Notre Dame L.Rev. 972, 972 (1986). Evidence of intent *and* effect helps the trier of fact to evaluate the actual effect of challenged business practices in light of the intent of those who resort to such practices.[21] As Justice Stevens stated in *Aspen Skiing*,

[E]vidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as "exclusionary" or "anticompetitive"—to use the words in the trial court's instructions—or "predatory," to use a word that scholars seem to favor. Whichever label is used, there is agreement on the proposition that "no monopolist monopolizes unconscious of what he is doing." As Judge Bork stated more recently: "Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended."

472 U.S. at 602–03, 105 S.Ct. at 2857–58 (quoting R. Bork, *The Antitrust Paradox* 160 (1978)).

The present case is in fact a useful example of the intent-*and*-effect approach to determining whether certain practices are predatory. As the preceding discussion of the "dilution effect" indicates, the jury's conclusion that the NFL's three network contracts were not exclusionary was supported by evidence that a quality league could either have overcome the "dilution effect" or have acquired a contract when the NFL's contracts expired. The conduct of the NFL itself and the networks showed

---

21. The USFL contends that the district court improperly added a specific intent requirement to Section 2 by instructing the jury that it "should infer no anticompetitive intent from the mere existence of" the NFL's three network contracts. This argument is groundless. The quoted language simply restated the district court's holding in its *Opinion No. 2* interpreting the Sports Broadcasting Act of 1961. In any event, the district court instructed the jury that "[m]onopoly power is obtained intentionally and this element is satisfied, if defendants acquired it by means other than superior skill or

historical accident" or "by any means of wielding monopoly power to prevent or impede competition." This instruction applied to both the professional football market and television submarket claims and fully complied with *Alcoa*'s requirement of only general intent for a monopolization violation. *See* 148 F.2d at 432. The usefulness in this area of the distinction between specific and general intent, moreover, may be diminished by *Aspen*'s description of the intent requirement as an evidentiary tool to evaluate business conduct.

their disbelief in any exclusionary effect by the NFL's threatening to leave a network without NFL games and the networks' taking the threat seriously. The evidence also supported the conclusion that when the NFL locked up the third network, CBS, in the 1982 negotiations, it did so to obtain $736 million in rights fees, not to exclude competitors.

Judge Leisure's instructions to the jury with respect to the Section 1 Rule-of-Reason claim stated that intent was not determinative as to whether a practice was an unreasonable restraint of trade:

Examining the combination's purpose may assist you in determining the effects of the agreement on competition. The mere fact that the defendants had a good motive or sound purpose for entering into an agreement, however, does not in and of itself prevent you from finding that the agreement was an unreasonable restraint of trade.

On the other hand, the mere fact that defendants entered into an agreement with the intent of excluding competition, is not enough to establish a Section [1] violation. Even if you find that defendants' intent was evil or unlawful, you still must find evidence of anticompetitive effect before you can find a particular restraint of trade is unreasonable.

We disagree with the USFL that proof of either anticompetitive intent *or* effect is sufficient in a Rule-of-Reason case under Section 1. Unlike a *per se* price-fixing case, a Rule-of-Reason case requires the fact finder to balance the procompetitive and anticompetitive *effects* of any restraint. *See, e.g., National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 691 & n. 17, 98 S.Ct. 1355, 1365 & n. 17, 55 L.Ed.2d 637 (1978). Except for *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.) (in banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), the cases cited by the USFL are *per se* price-fixing cases. We have previously stated, however, that we "doubt" that the purpose-*or*-effect requirement stated in *Oreck* "is a disjunctive rule," and that "it is difficult to conceive of a viable private ac-

tion for damages under section 1 if some unreasonable restraint of trade has not been effected." *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 397 & n. 4 (2d Cir. 1980). Other courts agree, *see, e.g., Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.*, 710 F.2d 1366, 1372–73 (9th Cir.1983); *Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1202–03 (6th Cir.1982); *H & B Equip. Co. v. International Harvester Co.*, 577 F.2d 239, 246 (5th Cir.1978), and we now hold, for reasons stated in our discussion of the Section 2 claim, that an anticompetitive effect must be shown to make out a Section 1 Rule-of-Reason violation.

### d. Legitimate Business Opportunities and Profit–Maximization Charge

The USFL further argues that the district court erroneously charged the jury that the NFL's three network contracts were lawful if motivated by any "legitimate" purpose, including profit maximization. The pertinent charge reads as follows:

Plaintiffs allege that the NFL coerced the networks not to give the plaintiffs a contract.... So long as they have a legitimate business purpose in doing so, defendants have no duty to limit themselves in entering into the television contracts so that other football leagues would have an easier time entering the market, or to foresee that other leagues might do so, or for any reasons to decline a profitable business opportunity.

This charge was consistent with settled precedent. "[A] firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches." *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987); *see Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir.1986); *Berkey Photo*, 603 F.2d at 274, 276, 287. A monopolist may not, of course, use its market power, whether obtained lawfully or not, to prevent or impede competition in the rele-

vant market. *See Aspen Skiing*, 472 U.S. at 605, 105 S.Ct. at 2859; *Berkey Photo*, 603 F.2d at 274. The jury was thus properly instructed that:

> A monopoly achieved or maintained as a result of ... legitimate good business practices is not unlawful. A monopolist has the same right to compete as any other company. Under the antitrust laws, a monopolist is encouraged to compete vigorously with its competitors and to remain responsive to the needs and demands of its customers. At the same time, a monopolist cannot use its lawfully acquired power to maintain its monopoly.
>
> In addition, there is nothing in the antitrust laws that requires a monopolist to act against its own self interest so long as the monopolist does not at the same time exercise its power to maintain that power. Thus, a monopolist is under no duty affirmatively to help or aid its competitors and is free to set as its legitimate goal the maximization of its own profits so long as it does not exercise its power to maintain that power.

■ The USFL challenges this charge on the ground that setting prices at a profit-maximizing level is an anticompetitive act. We disagree. Prices not based on superior efficiency do not injure competitors, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582–83, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986), but rather invite competitive entry. As we stated in *Berkey Photo:*

> Setting a high price may be a use of monopoly power, but it is not in itself anticompetitive. Indeed, although a monopolist may be expected to charge a somewhat higher price than would prevail in a competitive market, there is probably no better way for it to guarantee that its dominance will be challenged than by greedily extracting the highest price it can.

603 F.2d at 294. The USFL responds to this argument by falling back on its claim that professional football is not a typical market because of the "dilution effect," an argument rejected by the jury and discussed *supra.*

### e. Television Submarket Definition

Regarding the relevant television submarket, the district court instructed the jury, first, to determine who were the potential purchasers of television broadcast rights for professional football in the fall. The jury was then, second, to determine from the perspective of those buyers what other products, if any, were reasonably interchangeable with broadcast rights to professional football. The USFL claims in particular that, in instructing the jury to determine who were potential purchasers, the district court erred by stating that:

> If you find that a professional football league would reasonably consider selling its broadcast rights to cable television companies or to individual television stations, then all those buyers must be included in the relevant submarket.

■ We do not agree with the USFL that this charge was error because it emphasized the view of potential buyers in determining the relevant submarket. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956); *see also United States v. Waste Management, Inc.*, 743 F.2d 976, 979–80 (2d Cir.1984) (defining relevant market by first determining potential buyers and then determining what products were reasonably interchangeable from buyers' perspectives); *JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 698 F.2d 1011, 1016–17 (9th Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983). The fact that a cable contract might be less desirable, even much less desirable, to a league than a network contract is not relevant to determining the product submarket.

In any event, the USFL never objected to the relevant submarket instruction, and the objection was thus waived under Fed.R.Civ. P. 51. Contrary to its claim on appeal, the USFL did not "distinctly" object to this instruction, but merely proposed changes in language in the draft charge. These suggestions did not constitute a general objection to the entire charge. Indeed, the

district judge expressly stated his understanding that the parties had objected only "*to the extent* [of] proposed changes in the charge" (emphasis added). This was apparently the understanding of the USFL as well because the league raised a "general objection" to the intent-*and*-effect charge.

#### f. The Supplemental "Unambiguous Evidence" Charge

The USFL also challenges the supplemental "unambiguous evidence" instruction given by Judge Leisure in response to a note from the jury. The note sought guidance as to what the jury should do if it were to define a television market or submarket broader than the market alleged by the USFL. The supplemental instruction stated in part that:

> If you answer the second part of Question 3 [possession of monopoly power in the relevant submarket] in terms of your own broader definition of a relevant market or submarket, then I must also instruct you that you may only find that the NFL has monopoly power in this broader submarket if plaintiffs have produced unambiguous evidence that the defendants have the power to control prices or exclude competition in this broader market. Unambiguous evidence is evidence of a kind which is so clear that it supports only one conclusion.

The USFL contends that the instruction concerning a need for unambiguous evidence of the power to control prices or exclude competitors should not have been given.

■ An "unambiguous evidence" instruction regarding the power to control prices or to exclude competition is appropriate where market share data for the relevant market is lacking. *See Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.,* 651 F.2d 122, 130 (2d Cir.) ("when such a traditional form of proof [as market share data] is lacking, the plaintiff must produce unambiguous evidence that the defendant has the power to control prices or exclude competition"), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). Absent market share

data, definite evidence of monopoly power is needed lest profitability alone provide a basis for antitrust liability.

The parties' arguments on this point are based on differing assumptions as to what the jury actually did with regard to the submarket definition. The USFL assumes that the relevant submarket found by the jury was the sale of broadcasting rights for professional football in the fall to the networks, cable and syndicators. · Because there was market share data for that submarket—during 1983–86, for example, $1.7685 billion in revenue to the NFL, $65.9 million to the USFL—it understandably concludes that the "unambiguous evidence" supplemental instruction was error. The NFL assumes that the relevant submarket found by the jury was the sale of broadcasting rights for professional football, other sporting events and television programming generally to the networks, cable and syndicators. Because no meaningful market share data was introduced for that much broader submarket, the NFL understandably concludes that the supplemental instruction was eminently correct. These differing assumptions require us to examine certain events at trial in some detail.

The pertinent portion of the submarket instructions reads as follows:

> In this case plaintiffs allege the existence of a relevant submarket in the nationwide market for the sale of network television broadcasting rights for major league professional football games in the fall.

Defendants dispute plaintiffs' definition of the relevant submarket in at least two respects. First, the defendants contend that the buyers of broadcast rights are not limited to television networks. Instead, they say that football leagues and others who sell programs to be televised to the public can and do sell them to other buyers, such as individual television stations, through the process of syndication, and cable television companies, such as ESPN or Turner Broadcasting. If you find that a professional football league would reasonably consider

selling its broadcast rights to cable television companies or to individual television stations, then all those buyers must be included in the relevant submarket.

Second, the defendants say that the relevant submarket is not limited to the sale of rights to telecast professional football in the fall, but should instead include the sale of broadcast rights for other sports programming, such as college football, and for other general entertainment programming. In order for plaintiffs to prove that their definition of the relevant submarket is correctly limited to the sale of broadcasting rights for professional football in the fall, plaintiffs must show that the purchasers of those rights did not regard other types of programming as reasonably interchangeable substitutes for professional football.

In other words, you have to decide whether, based on all the evidence you have seen and the testimony you have heard, whether broadcasting rights to professional football in the fall compete as a product with broadcasting rights for other sporting events and other television programming. If you find that such competition does exist, then you have necessarily found that the relevant submarket is broader than the plaintiffs have alleged. If, on the other hand, you find that the sale of broadcasting rights for professional football in the fall is a specific universe, and that the buyers of those rights do not have reasonably interchangeable substitutes, then you have necessarily found that plaintiffs are correct in having limited the relevant submarket to the sale of broadcasting rights for professional football in the fall.

The jury was thus asked to undertake the following tasks: (i) determine whether buyers in the submarket include cable and syndicators as well as the networks, and (ii) determine whether those buyers regard the broadcasting rights to professional football in the fall as reasonably interchangeable with broadcasting rights to other sporting events and other programming. However, the interrogatory on the verdict sheet asked only:

2. Is there a relevant market or submarket, as alleged by plaintiffs, consisting only of the sale to the networks of television broadcasting rights for major league professional football in the Fall?

YES ____ NO ____

What appears to have been overlooked by counsel and the district court is that while the answer "YES" would complete the jury's tasks, the answer "NO" might not. A "NO" answer would leave unresolved the question of whether the relevant submarket was the sale of broadcasting rights to football to networks, cable and syndicators, or the sale of broadcasting rights to programming generally to networks, cable and syndicators. After it in fact decided to answer interrogatory 2 "NO," the jury thereupon sent a note asking for guidance as to what it should do next.

A colloquy took place over the proper response to the jury's question. The NFL took the position that a "NO" answer to the interrogatory obviated the need for the jury to answer any further interrogatories concerning monopolization of the television submarket. The USFL argued that the jury must go on to answer the questions concerning monopolization of whatever submarket it did find. Counsel for the USFL thus stated:

MR. MYERSON: What the jury is saying is that if they find that the submarket is broader than sale by networks of television broadcasting rights for major league professional football, do they necessarily have to answer no to the question of did defendants willfully acquire or obtain monopoly power in either of the relevant market or submarket. And they say, or can we instead use our broader definition of what the relevant submarket is and answer whether or not the defendants have willfully acquired or maintained monopoly power in the relevant submarket.

To follow Mr. Fiske's argument, what Mr. Fiske is asking the court to say is that you automatically must answer no, the defendants did not willfully acquire or maintain monopoly power in the rele-

vant submarket merely because they find that the relevant submarket is broader than broadcasting rights for major league professional football. And what we are saying to the court is that, as your Honor has already instructed, the relevant submarket may be broader, and then and obviously then when they define the relevant submarket do they answer the question 4: "Did defendants willfully acquire and maintain monopoly power in the relevant market or submarket?"

And in 5, did the defendants' monopolization of the relevant market cause the injury, and in 6, etc. But to take the position that we lose the opportunity for the jury to say whether or not the defendants monopolized in a submarket merely because they think that the submarket may be broader than we submit, is inconsistent with your Honor's charge to the jury and to the law.

The jury's province under your Honor's instruction is to determine what they think the accurate submarket is and then to answer the question of whether within their definition of what the accurate submarket is, defendants monopolized or attempted to monopolize in the way set forth in the verdict.

\* \* \* \* \* \*

What the jury is asking is, if the submarket is broader in their view than just network, and presumably includes, as your Honor instructed they could find, cable TV or individual television stations as set forth on page 37, the jury is then saying do we necessarily have to answer no to the question of whether they have monopoly power in that submarket, and for them to argue yes, the jury has to say no because they found a broader submarket goes totally inconsistent and it is the antithesis of what your Honor instructed and what they asked your Honor to instruct over my objection.

What was lost in the verbal traffic over whether the jury should continue to answer questions on the verdict sheet was the fact that the jury had to determine not only whether the relevant buyers included cable and syndicators as well as the networks but also whether those buyers, once determined, would consider rights to fall professional football reasonably interchangeable with rights to other programming. This distinction was of little importance at the time of the colloquy because the "unambiguous evidence" instruction apparently was not yet in the picture.

After a break, during which counsel for the NFL submitted handwritten proposed instructions containing, apparently for the first time, the "unambiguous evidence" charge, the court reconvened outside the presence of the jury. The district judge offered the parties a chance for a side-bar discussion that was not accepted, although the challenged instruction was now on the table. He thereupon called in the jurors and told them that they should go on to answer the other questions relating to the television submarket even if they redefined that submarket. He then gave the "unambiguous evidence" instruction. No exception to that charge was taken at that time.

Fifteen minutes later, the jury came in with another question, and at that point the USFL objected to the supplemental instruction with regard to "unambiguous evidence." The district judge expressed mild surprise because he believed the instructions quite favorable to the USFL in allowing the jury to continue to answer questions concerning the submarket. Counsel for the USFL stated:

MR. MYERSON: [T]he applicable authorities, as plaintiffs have read them, stand for the proposition that the unambiguous evidence instruction is reached only in the absence of market share data, and it is plaintiffs' position, as the court is aware, that there is market share data even on the broader submarket that includes other forms of TV, and including ESPN, cable, etc., and with respect to even a broader submarket, including ESPN, cable, etc., there is market share data in the record showing an NFL share higher than 90 percent, and for that reason we object to the charge given by your Honor.

Counsel for the USFL did not bring to the district court's attention the distinction between a submarket consisting of the sale of broadcasting rights to fall professional football to the networks, cable and syndicators, and a submarket consisting of the sale of broadcasting rights to programming generally to the networks, cable and syndicators. This was not an insignificant omission because an objection based on the proffered market share data had no merit whatsoever with regard to the broader market and the various colloquies leading up to the objection had served to blur what had now become a critical distinction.

The USFL was entitled at best to an instruction that monopolization of the narrow submarket could be found after resort to ordinary evidentiary principles. Such an instruction would have to be accompanied, however, by a further statement that monopolization of the broad submarket could be based only on "unambiguous evidence." The broad objection made by the USFL to the supplemental instruction did not, therefore, bring to the attention of the district court a valid claim of error, and a more precise claim cannot be raised on appeal. *See* Fed.R.Civ.P. 51 (counsel must state to district court "distinctly the matter objected to and the grounds of objection").

We also note that it is not at all clear that the jury determined the relevant submarket to be the narrow market for broadcasting rights to fall professional football. After the jury went back to its tasks, it arrived at a verdict that we reproduce in pertinent part.

JUDGE LEISURE

*Court's Exhibit #16 7/29/86 Sherman Act Section 2*

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X
UNITED STATES FOOTBALL LEAGUE, et al., :

 Plaintiffs. :

 -against- :

NATIONAL FOOTBALL LEAGUE, et al., :

 Defendants. :

- - - - - - - - - - - - - - - - -X

JURY VERDICT SHEET
& INTERROGATORIES

84 Civ. 7484 (PKL)

 We, the jury, unanimously make the following findings and render the following verdicts with respect to each of the claims alleged in this case:

RELEVANT MARKET

 1. Is there a relevant market, as alleged by plaintiffs, consisting of major league professional football in the United States?

 YES √ NO _____

The burden of proof is on plaintiffs to prove by a preponderance of the evidence that the answer is "yes".

 2. Is there a relevant market or submarket, as alleged by plaintiffs, consisting only of the sale to the networks of television broadcasting rights for major league professional football in the Fall?

 YES _____ NO √ 

The burden of proof is on plaintiffs to prove by a preponderance of the evidence that the answer is "yes".

2A. WE the JURY haVE REDEFFIND the RELEVANT SUBMARKET TO INCLUDE NOT ONLY the SALE TO the NETWORKS OF TV BROADCASTING Rights but ALSO TO INCLUDE CABLE AND SYNDICATION.

COPIES FROM ORIGINAL
2/30/86

### SHERMAN ACT SECTION 2

### A. Actual Monopolization

Answer Question 3 only if you have answered "yes" to either Questions 1 or Question 2, or both.

3. Does the NFL have monopoly power, that is, the power to control prices or exclude competition in either the relevant market or submarket?

> (Check the market or submarket, if any, you have found to exist and then answer this question only as to such market, or submarket, or both):

In a relevant market consisting of major league professional football in the United States?

YES ✓ NO _____

In a relevant market or submarket consisting only of the sale to the networks of television broadcasting rights for major league professional football in the Fall?

YES _____ NO ✓

The burden of proof is on plaintiffs to prove by a preponderance of the evidence that the answers are "yes".

---

No party made an application to clarify the verdict. If the handwritten redefinition of the submarket in "2A" included only the sale of broadcasting rights to major league professional football in the fall, then the "unambiguous evidence" instruction may have misled the jury in answering the second part of question No. 3, even though the printed statement regarding the burden of proof would tend to counteract it. If "2A" included the sale of broadcasting rights to programming generally, then the supplemental instruction was correct.

We believe the redefinition of the submarket stated in "2A" is ambiguous and

cannot be determined on the present record. If one looks at the handwritten redefinition in isolation, the failure to modify the words "broadcasting rights" would imply the broadest definition, or television programming generally. If one looks at page one of the verdict sheet in isolation, it might appear that the jury omitted solely for the sake of convenience the words from question No. 2 immediately above "for major league professional football in the Fall." However, neither the handwritten redefinition nor the verdict sheet can be viewed in isolation. The jury had a copy of the charge in the jury room and the words "broadcasting rights" were used in that charge to describe each of the relevant submarkets. Indeed, the second paragraph of the portion of the television submarket charge quoted above specifically mentioned sales to cable and syndicators by "others [besides football leagues] who sell programs to be televised." We cannot assume that the jury believed that "broadcasting rights" was a short-hand term for professional football rights only.

■ We therefore cannot say that the jury's failure to include a modifying phrase providing a full description of the broadcasting rights represented a rejection of the NFL's contentions with regard to the broader submarket of television programming generally. We believe the failure of the USFL to seek clarification of the verdict, in addition to its failure to make a precise objection to the supplemental instruction, precludes it from claiming error now.[22] Courts have held that a party's failure to bring alleged inconsistencies in the verdict sheet to the court's attention before the jury has been discharged waives the right to have the alleged inconsistencies remedied by a new trial. *See, e.g., Strauss v. Stratojac Corp.,* 810 F.2d 679, 682–83 (7th Cir.1987); *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,* 791 F.2d

1416, 1423 (10th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986); *Fernandez v. Chardon,* 681 F.2d 42, 58 (1st Cir.1982), *aff'd,* 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983); *Stancill v. McKenzie Tank Lines, Inc.,* 497 F.2d 529, 534–35 (5th Cir.1974). We believe that similar considerations justify application of doctrine of waiver where, as here, the jury returns an ambiguous verdict and counsel fails to seize the opportunity to raise an appropriate objection.

In any event, we believe it highly unlikely that the jury's verdict was affected by the events described above. Neither the USFL's Rule-of-Reason claim nor its essential-facilities claim was affected by the redefined submarket or the "unambiguous evidence" instruction. Nevertheless, the jury rejected the USFL's contentions regarding the NFL's network television contracts in both those claims. Given the common evidentiary basis for all the USFL's television claims described *supra,* it is most improbable that the "unambiguous evidence" instruction affected the jury's verdict on question No. 3 even if the submarket included only broadcasting rights to football.

### g. Consumer–Satisfaction Charge

■ The district judge also charged that in considering whether the NFL had engaged in anticompetitive conduct, the jury might "consider ... whether in a freely competitive market there would be any dissatisfaction with the present choices on the part of the buyers" or "whether or not the choices of those who purchased the rights to show or televise football have been restricted." This instruction was correct. An inquiry into consumer preference is obviously relevant to a determination of whether a monopolist has engaged in predatory conduct. *See Aspen Skiing,* 472 U.S. at 605, 105 S.Ct. at 2858. Given the

---

**22.** We are aware that the NFL described the redefined market as being limited to the sale of broadcasting rights to football in a posttrial memorandum. *See* Memorandum of Law in Opposition to Plaintiffs' Request for Permanent Injunctive Relief at 33. The point being made, however, was in no way dependent on how the

submarket was defined, and we see no reason to bind the NFL to that statement. As stated in the text, someone looking solely at the verdict sheet would reach that conclusion. In any event, the question is whether an adequate exploration of the issue was made before the district judge.

USFL's vigorously pressed claim that the NFL coerced the networks not to televise USFL games, it was entirely proper to allow the jury to consider whether the networks eschewed USFL fall contracts because of NFL coercion or because they were satisfied with the NFL's product.

### h. Essential–Facilities Charge

Finally, the USFL contends that it was held to an improperly high standard of proof on its "essential-facilities" claim. We set out the pertinent charge:

Plaintiffs allege that defendants violated Sections [1] and [2] of the Sherman Act by conspiring to and in fact denying plaintiffs access to a satisfactory national broadcast television contract for future seasons, with any one of the three networks. The legal basis for this particular claim by plaintiffs is that a network contract is an essential facility which the USFL or any other professional football league needs in order to compete in major league professional football.

You should only consider this claim if you have already found, pursuant to my earlier instructions, that defendants possess monopoly power in a relevant market or submarket. If you have not found that defendants possess monopoly power, you must return a verdict in defendants' favor on this claim.

In order to prove their essential "facilities" claim, plaintiffs must prove all of the following elements by a preponderance of the evidence:

First: That a national broadcast television contract with at least one of the three networks, CBS, NBC or ABC is essential to the ability of a professional football league to compete successfully in the United States;

Second[:] that potential competitors of the NFL cannot as a practical matter, duplicate the benefits of a network contract;

Third: That the defendants control access to each of the three networks, that is, the defendants themselves have the ability by their actions to deny actual or

potential competitors, such as the USFL, access to national broadcast television—access to a national broadcast television contract;

Fourth: That the defendants through their actions have exercised their ability to deny actual or potential competitors access to a national broadcast television contract by denying the USFL such access;

Fifth: That a national broadcast television contract between one or more of the networks and a professional football league other than the NFL would not interfere with any of the defendants' lawful dealings with those networks.

■■■ The USFL argues first that this charge erred in failing to distinguish between a network television contract in the spring and one in the fall. The charge did, however, address the USFL's denial of "access to a *satisfactory* national broadcast contract for future seasons" (emphasis added). The jury was well aware of the USFL's claim that a spring contract was unsatisfactory as an "inferior facility" or "minor league." It thus either rejected that characterization of spring football or rejected the USFL's claim that the NFL could deny the USFL access to a network in the fall. The spring-fall issue was thus before the jury.

The USFL next claims that it was error for the district court to require a showing of monopoly power in a relevant submarket or market before considering the essential-facilities claim. We fail to see why the USFL challenges this instruction because the jury did find monopoly power in a relevant market and therefore *did* consider the essential-facilities claim. Had the challenged instruction been omitted, the verdict would have been exactly the same.

■■■ Finally, the USFL claims that the district court erred by instructing the jury that one element of an essential-facilities claim is that an antitrust defendant "control access" to the facility. In the USFL's view, this element requires a showing only of "defendants' contribution to the prevention of plaintiffs' access to the facility." The requirement that the defendant control

access to the facility is established in the caselaw, *see, e.g., MCI Communications Corp. v. AT & T Co.,* 708 F.2d 1081, 1132 (to establish liability under the essential facilities doctrine, plaintiff must prove defendant's "control of the essential facility"), *modified on other grounds,* 1983–2 Trade Cas. (CCH) ¶ 65,520 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), and is necessary because an essential-facilities claim must be brought against the party that can provide access to the facility.

### 2. *The District Court's Evidentiary Rulings*

#### a. The USFL's Merger Strategy

The USFL vigorously contends that the NFL's introduction of evidence of its merger strategy enabled the NFL to present an impermissible *in pari delicto* or unclean-hands defense under the guise of damage causation. This claim is frivolous.

▊▊▊▊ It is true that a plaintiff's own anticompetitive conduct generally cannot be raised as a defense to liability in an antitrust action. *See Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968) (rejecting *in pari delicto* defense that plaintiff's participation in challenged scheme barred recovery); *Kiefer–Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951) (rejecting unclean-hands defense based on plaintiff's involvement in unrelated conduct). The defense may be available, however, when the plaintiff was present at the creation and had a complete and continuing involvement in the monopolization scheme. *See Perma Life,* 392 U.S. at 140, 88 S.Ct. at 1985; P. Areeda & D. Turner, *Antitrust Law* ¶ 348c (1978).

▊▊▊▊ Whatever its force or content, the *in pari delicto* defense was never interposed by the NFL, and the evidence in question was quite properly admitted as relevant to causation and damages. Stretching dictum in *Perma Life* beyond recognition, the USFL misreads that decision to proscribe the introduction of evidence that might "prejudice the jury improperly into evaluating 'the relative moral worth of the parties.'" USFL Reply Br. at 14 (quoting *Perma Life,* 392 U.S. at 139, 88 S.Ct. at 1984). Neither *Perma Life* nor *Kiefer–Stewart* suggests that otherwise readily admissible evidence must be excluded because it might also be relevant to an *in pari delicto* or unclean-hands defense. In fact, *Perma Life* explicitly states that such evidence "can of course be taken into consideration in computing damages." 392 U.S. at 140, 88 S.Ct. at 1985; *see also First Beverages, Inc. v. Royal Crown Cola Co.,* 612 F.2d 1164, 1175 (9th Cir.) (plaintiff's anticompetitive conduct could be introduced "to disprove part or all of the claimed damages"), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); *Pearl Brewing Co. v. Jos. Schlitz Brewing Co.,* 415 F.Supp. 1122, 1131 (S.D.Tex.1976) ("evidence introduced by defendant of such conduct, if any, by a plaintiff which heretofore was labeled as '*in pari delicto*' now is appropriate when it provides rebuttal to that plaintiff's allegations of causation of injury by defendant and resulting damages therefrom"). Such evidence also can be used for purposes of impeachment. *See Memorex Corp. v. IBM Corp.,* 555 F.2d 1379, 1384 n. 8 (9th Cir.1977).

As with any evidence, therefore, the district judge had broad discretion to determine whether the probative value of the evidence of a merger strategy was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. His decision that evidence of business decisions made by the USFL pursuant to the merger strategy was highly relevant to the issues of causation and damages and not outweighed by any prejudicial effect was clearly correct. This evidence was highly probative on the central issue of whether the USFL's alleged injury and damages, particularly with regard to its failure to obtain a fall network contract, were caused by the NFL's anticompetitive conduct or by the USFL's own deliberate business judgments. *See, e.g., Costner v. Blount Nat'l Bank,* 578 F.2d 1192, 1195 (6th Cir.1978); *Heatransfer Corp. v. Volkswagenwerk,*

*A.G.,* 553 F.2d 964, 983 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Borger v. Yamaha Int'l Corp.,* 625 F.2d at 399.

For example, Eddie Einhorn, the USFL owner who was to represent the USFL in negotiations with the networks for a fall contract, warned his fellow owners at a meeting in August 1984:

> We're starting to look for merger cities. Let's be honest about it. We're getting out of certain cities because we don't—they're getting taken in by the other League, and we're looking for merger cities. We've got to get it on the table tomorrow or this afternoon and start looking at this damn thing. I have the television; I got other problems.
>
> You can't get out of all the cities ahead of time because then you got no TV markets left. It's one of these chicken and egg deals. It's great to get out of them if we're absorbed; but if you're going to exist and need someone else to pay us television money, we can't get out of every city we've got here and just move into cities that aren't in the NFL or we're not going to have any product.

It quite simply defies logic for the USFL to assert on the one hand that it was denied a network contract indispensable to its survival because of the NFL's anticompetitive acts and to argue on the other for exclusion of evidence that the owners of USFL franchises knowingly lessened the value of their product to television. Courts do not exclude evidence of a victim's suicide in a murder trial.

To take another example, USFL Commissioner Usher testified that the USFL suffered a "tumbling" of teams and abandoned its spring season because NFL "pressure" caused ABC to withhold broadcast rights payments and to reject any proposal to televise the USFL. He further stated that the USFL sought competition between, rather than a merger of, the leagues, and that NFL pressure forced the USFL to move its teams from highly-rated television markets into low-rated non-NFL markets. Given that testimony, Judge Leisure would have erred had he not concluded that:

> certain of Usher's answers ... put in issue the *fact* of the merger motive ... [t]hus ... put[ting] in issue plaintiffs' theory that the cause of the moves to the [non-NFL] cities was NFL conduct. In addition, Usher has put in evidence the state of mind of the USFL owners who, he claims, moved the teams because of NFL competitive pressures.
>
> The proffered trial exhibits ... suggest that the reason the USFL decided to move those teams was to position the league for a merger. Certainly, if Usher claims that the basis for the USFL owners' decisions for [moving] the teams was by reason of NFL conduct, the NFL should be entitled to show that there is evidence that suggests that the USFL owners had a different motive.

Moreover, it was clearly proper for the NFL to use evidence of this strategy for impeachment purposes. *See Memorex,* 555 F.2d at 1384 n. 8. Although the USFL's desire to exclude this evidence is understandable, its own claims made it inevitable that the merger strategy and its resultant effect on the USFL's value as a television product would become an issue at trial. Indeed, the door was ajar to such evidence as early as the USFL's counsel's opening statement, in which he outlined the USFL's television claims. *See United States v. Bari,* 750 F.2d 1169, 1180 (2d Cir.1984) (door may be opened through counsel's opening statement), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

Judge Leisure correctly circumscribed the uses to which the evidence of a merger strategy was put and gave a limiting instruction to the jury four times. In part, that limiting instruction stated that "the nature of plaintiffs' conduct must have no bearing on your evaluation of whether the defendants did anything in violation of the antitrust laws." [23] We have on "numerous

---

**23.** The full limiting instruction was as follows:

> You have heard arguments presented by counsel and questions asked of witnesses which

occasions" found that such "an instruction was sufficient to enable the jury to limit its consideration of the evidence to the purpose for which it was offered." *United States v. Siegel*, 717 F.2d 9, 18 (2d Cir. 1983).[24]

■■■■ Finally, we reject the USFL's claim that particular items of evidence of its merger strategy were inadmissible on other grounds. It was hardly an abuse of discretion to admit USFL owner Myles Tannenbaum's view of the three ways to make money in professional football, namely "tickets, television and triple damages," to show that plaintiffs, after failing in the marketplace, sought to compel a merger through the threat of antitrust litigation. *See Argus v. Eastman Kodak Co.*, 801 F.2d 38, 43 (2d Cir.1986) (relying on evidence that plaintiff had been "searching for the means of entering the antitrust fray"), *cert. denied*, —— U.S. ——, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). With respect to the McKinsey & Company report advising against a shift to fall play, Judge Leisure limited its use to showing that advice paid for by, and given to, the USFL owners was not followed. The report was not admitted for the truth of the statements contained therein. *See Siegel*, 717 F.2d at 18.

### b. Prior NFL Antitrust Judgments

In his *Opinion No. 3*, Judge Leisure excluded from evidence prior court decisions that found the NFL to have violated Section 1 of the Sherman Act. 634 F.Supp. at 1171–75. The USFL contends on appeal that this ruling was error, and that the NFL used this ruling as a "shield" to present a "good monopolist" defense.

■■■■ Prior antitrust violations and the history of competition in a market may, in appropriate cases, be admissible to establish market power and intent to monopolize. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. at 576, 86 S.Ct. at 1706; *Lorain Journal Co. v. United States*, 342 U.S. 143, 152–53, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951). Such evidence also may be admissible to establish the intent, motive and method of a conspiracy under Section 1. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 710, 82 S.Ct. 1404, 1416, 8 L.Ed.2d 777 (1962). In order for the NFL's prior antitrust judgments to be admissible, however, the USFL bore the burden of demonstrating that the conduct underlying those prior judgments had a direct, logical relationship to the conduct at issue in this case. *See Buckhead Theatre Co. v. Atlanta Enters., Inc.*, 327 F.2d 365, 368–69 (5th Cir.) (evidence of prior antitrust judgment irrelevant unless plaintiff introduced evidence that practices complained of in prior case "had an injurious effect upon the plaintiff"), *cert. denied*, 379 U.S. 888, 85 S.Ct. 158, 13 L.Ed.2d 92 (1964); *Bray v. Safeway Stores, Inc.*, 392 F.Supp. 851, 866 (prior antitrust judgment admitted where underlying conduct was same as that alleged in main case) (citing *FTC v. Cement Inst.*, 333 U.S. 683, 705, 68 S.Ct. 793, 805, 92 L.Ed. 1010 (1948)), *vacated per settlement*, 403 F.Supp. 412 (N.D.Cal.1975).

■■■ Judge Leisure found that the USFL never made such a showing, and,

---

have brought to your attention the allegation that in some respects plaintiffs ... may have had a motive to attempt to force a merger with the NFL in one of several ways.... Any arguments that suggest that such conduct is unethical or somehow improper, are themselves inappropriate in this type of case, and in the context of this lawsuit. Whether plaintiffs ... may have pursued such conduct is irrelevant to the issue of whether the defendants here on trial engaged in any anticompetitive conduct towards the plaintiffs.

Defendants ... are entitled to show you, however, that certain business decisions may have been the cause of the poor financial health of the USFL. Thus, while plaintiffs contend that

they have been injured by defendants' anticompetitive conduct, defendants contend that certain USFL business decisions caused the financial harm to plaintiffs.

But, I must remind you that the nature of plaintiffs' conduct must have no bearing on your evaluation of whether the defendants did anything in violation of the antitrust laws.

**24.** The USFL's claim that two jurors were improperly influenced by evidence of the merger strategy despite the district court's limiting instruction must also be rejected. *See* Fed.R.Evid. 606(b) (prohibits use of extrajudicial statements by jurors to impeach verdict).

although we do not fully embrace his reasoning, we agree that the prior judgments should not have been admitted as evidence of a longstanding conspiracy somehow casting light on current alleged illegalities. Two of the decisions in question, *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C.Cir. 1978) (invalidating rules for NFL player draft); *Mackey v. National Football League*, 543 F.2d 606 (8th Cir.1976) (invalidating "Rozelle Rule" for compensation of free agents), are not consistent with our decision in *Wood v. National Basketball Ass'n*, 809 F.2d 954 (2d Cir.1987). The three others, *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381 (9th Cir.) (invalidating NFL Rule 4.3 limiting franchise relocation), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984), *later opinion*, 791 F.2d 1356 (9th Cir.1986), *cert. denied*, — U.S. ——, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987); *North Am. Soccer League v. National Football League*, 670 F.2d 1249 (2d Cir.) (invalidating rule forbidding franchise owners from owning other professional sports teams), *cert. denied*, 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982), and *United States v. National Football League*, 116 F.Supp. 319 (E.D.Pa.1953) (invalidating rules limiting broadcast of games into home territories of other teams), involve difficult antitrust questions that were (and, in circuits other than the place of decision, may still be) fair game for litigation. Accordingly, these cases are at best marginally probative of an ongoing intent to exclude competitors.

Judge Leisure excluded the latter three judgments on the ground that they involved intraleague restraints, whereas the instant litigation involves interleague competition. Although we hesitate to adopt a rule that anticompetitive restraints among competitors can never reveal monopolistic intent toward would-be entrants, we do note that sports leagues raise numerous difficult antitrust questions involving horizontal restraints and group boycotts. The very concept of a league involving separate business entities (teams) requires concerted behavior among them and the exclusion of outsiders. Even the drawing up of a schedule requires that horizontal competitors (teams) conform to jointly made decisions and necessarily excludes others. *See* R. Bork, *The Antitrust Paradox* 332 (1978). Moreover, the antitrust law governing horizontal arrangements among competitors and group boycotts has been fluid. With regard to arrangements among competitors, compare *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940) ("[u]nder the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se* "), with *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979) ("[n]ot all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints"). With regard to group boycotts, compare *Klor's Inc. v. Boradway–Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959) ("[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden [*per se* ] category"), with *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 30–31, 104 S.Ct. 1551, 1567–68, 80 L.Ed.2d 2 (1984) (exclusion of physician from hospital staff privileges not violation of antitrust laws "[w]ithout a showing of actual adverse effect on competition" in product market), and *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 296, 105 S.Ct. 2613, 2620, 86 L.Ed.2d 202 (1985) (group boycott was not *per se* illegal absent proof that buying cooperative possessed market power).

Accordingly, we are wary of allowing a trier of fact to draw inferences of intent from the outcome of prior lawsuits in an area so fraught with uncertainty and doubt. Our wariness in this regard is enhanced by the fact that the lawsuits most pertinent to the instant action—involving claims by another league or a team in another league—were in fact won by the

NFL. *American Football League v. National Football League*, 323 F.2d 124 (4th Cir.1963); *Mid–South Grizzlies v. National Football League*, 720 F.2d 772 (3d Cir. 1983). The district court thus acted within its discretion in excluding evidence of prior antitrust judgments against the NFL on the grounds that their prejudicial value outweighed their probative value under Fed.R. Evid. 403. *See International Shoe Mach. Corp. v. United Shoe Mach. Corp.*, 315 F.2d 449, 459 (1st Cir.) ("Whether admitted purely as 'background' evidence or not, evidence of a judicial determination of prior illegal conduct on the part of the defendant cannot help but have a great emotive impact on a jury."), *cert. denied*, 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed.2d 504 (1963); *see also Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 709 (2d Cir. 1983) (appellate court reluctant to overturn trial court decision under Rule 403 unless arbitrary or irrational).

■ We next consider several related evidentiary issues. The USFL claims that a statement by Commissioner Rozelle that the NFL was "in bed with" the City of Oakland should have been admitted. This statement, made during testimony before the Senate Judiciary Committee on a bill that would have given the NFL greater control over franchise relocation, indicated that the NFL had cooperated closely with the City of Oakland during the course of litigation seeking to keep the NFL Raiders in that city. The USFL hoped to use this statement to demonstrate the existence of a conspiracy between the NFL and the City of Oakland to destroy the USFL Invaders in order to bring about the return of the Raiders to Oakland. Judge Leisure again acted within his discretion in ruling that Rozelle's statement did not tend to prove such a conspiracy and that the statement's probative value was thus outweighed by its prejudicial effect because of the need for foundation testimony regarding the Raiders' litigation against the NFL.[25]

**25.** For similar reasons, exclusion of excerpts from minutes of the Oakland–Alameda County

■ Judge Leisure was also well within his discretion in excluding Al Davis's testimony about what Davis called the NFL's "habitual disregard" of antitrust advice. This evidence would have put before the jury the precise evidence of prior antitrust judgments previously and correctly deemed inadmissible. Moreover, Judge Leisure correctly found that this testimony was not admissible "habit" evidence under Fed.R.Evid. 406, because testimony as to "three or four episodes over a 20–year period" was hardly sufficient to "conclude that a pattern of behavior exists with respect to the conduct at issue here." *See G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1533 (11th Cir.1985) (error to admit collateral evidence of routine practice that falls short of "adequacy of sampling and uniformity of response" required by Rule 406). Finally, Judge Leisure properly prevented the USFL from attempting to impeach Commissioner Rozelle through an affidavit of Lamar Hunt, an NFL owner who also owned a professional soccer team. This testimony was hearsay and, if allowed, would have resulted in a "mini-trial about the NASL case [or] about the position Hunt took in that litigation." *See Bari*, 750 F.2d at 1178–79 (no abuse of discretion in refusing to permit cross-examination of witness that would lead to "mini-trial").

#### c. Legislative Process Evidence

The USFL claims that the district court erroneously excluded evidence relating to the activities of the NFL in Congress. This evidence included (1) the NFL's lobbying activities in connection with the 1961 Sports Broadcasting Act and the 1966 NFL–AFL merger legislation, (2) Congress's motives in enacting this legislation, and (3) Senator Alphonse D'Amato's knowledge of the NFL's use of "pressure" tactics in its congressional lobbying.

■ Legislative lobbying efforts cannot of course be the basis of antitrust liability. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127,

Coliseum Board of Directors was proper.

135–36, 81 S.Ct. 523, 528, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669–72, 85 S.Ct. 1585, 1593–94, 14 L.Ed.2d 626 (1965). Evidence of such lobbying may be admitted, however, "if it tends reasonably to show the purpose and character of the particular transactions under scrutiny," *Pennington*, 381 U.S. at 670 n. 3, 85 S.Ct. at 1593 n. 3 (quoting *FTC v. Cement Inst.*, 333 U.S. at 705, 68 S.Ct. at 805), and that evidence is more probative than prejudicial. *Id.*

■ We address first the exclusion of evidence about the Sports Broadcasting Act and the 1966 merger legislation. The USFL objects to the exclusion of a House Committee Report on the Sports Broadcasting Act, which stated that Congress expected professional sports leagues to institute competitive bidding for their television rights as soon as existing contracts expired. *See* H.R.Rep. No. 1178, 87th Cong., 1st Sess. (1961). The USFL sought to demonstrate by this report that the NFL had misled Congress by promising to put NFL telecasts (especially of the championship game) up for competitive bidding. Judge Leisure properly ruled that the interpretation of legislative history was not an issue of fact for the jury, *see Stissi v. Interstate & Ocean Transp. Co.*, 765 F.2d 370, 374 (2d Cir.1985), and that such evidence was otherwise excludable under Fed.R.Evid. 403 as overly prejudicial and confusing.

■ As to the NFL–AFL merger legislation, the USFL sought to introduce evidence that it was approved in part because the NFL had promised two powerful Louisiana lawmakers that a franchise would be awarded to New Orleans. The district court's refusal to admit such evidence was not an abuse of discretion, and we adopt Judge Leisure's reasoning as set forth in the margin.[26] We also reject the USFL claim with regard to the exclusion of alleg-

edly "doctored" minutes of NFL League meetings. In a pre-trial ruling, Judge Leisure correctly found. that these minutes, which were submitted to Congress in connection with the merger legislation, had not been doctored, and that plaintiffs' claim was just a "diversionary tactic."

■ Finally, we address the district court's exclusion of Senator D'Amato's testimony about the NFL's use of "pressure" tactics in Congress. These tactics allegedly included threats to certain members of the House and Senate to remove franchises from their states and promises to others to move franchises to their states. The USFL argued that these lobbying activities fell within the "sham" exception to *Noerr–Pennington*. We agree, however, with Judge Leisure that efforts to persuade government officials simply by appealing to their political interests have *Noerr–Pennington* protection. *See Noerr*, 365 U.S. at 142–44, 81 S.Ct. at 532–33; *Mid–South Grizzlies*, 720 F.2d at 784; *BusTop Shelters, Inc. v. Convenience & Safety Corp.*, 521 F.Supp. 989, 995 (S.D.N.Y.1981).

■ Evidence of lobbying may, as we have already stated, nevertheless be admitted as purpose or character evidence. *See Pennington*, 381 U.S. at 670–71 n. 3, 85 S.Ct. at 1593 n. 3. Judge Leisure thus allowed Senator D'Amato to testify about the Senator's own experience with the NFL's lobbying after formation of the USFL in 1982, but forbade any reference to prior lawsuits or to particular legislation. Senator D'Amato was also not permitted to testify concerning double-hearsay statements made by NFL officials to other members of Congress. Even if these statements could survive a hearsay objection, however, they were properly excluded on two other grounds. First, the testimonial privilege that members of Congress enjoy under the Speech or Debate Clause of the

26. The district court found that: (1) "an important aspect of the NFL's purpose in seeking the 1961 exemption was to join the other professional sports organizations in being able to enter into pooled rights television contracts," *Opinion No. 3*, 634 F.Supp. at 1171; (2) one of the terms of the 1966 merger was an increase in the number of teams; (3) at the NFL's request,

the merger legislation did not grant the combined league any greater antitrust immunity than existed before the merger; (4) evidence on state of mind as to lobbying that took place fifteen to twenty years earlier was weak; and (5) the evidence was, in any event, merely cumulative. *See generally id.*

Constitution, art. I, § 6, cannot be waived by another member (in this case, Senator D'Amato). As Judge Leisure stated, the underlying purpose of the Speech or Debate Clause, which is to "protect the integrity of the legislative process by insuring the independence of individual legislators," *United States v. Brewster,* 408 U.S. 501, 507, 95 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972), would be "ill-served" if such waivers were permitted. Second, this testimony was properly excluded under Fed.R.Evid. 403 because of its potentially prejudicial impact on the jury.

Finally, with regard to all of the excluded evidence relating to the legislative process, we tend to share the view of the Third Circuit that, "[i]f these allegations are true, ... they are, perhaps, instructive on the nature of the federal legislative process. For purposes of [the Sherman Act], however, they are irrelevant." *Mid–South Grizzlies,* 720 F.2d at 784.

#### d. Examination of Damages Experts

■ The USFL further claims that Judge Leisure erred by not permitting the cross-examination of Dr. Bruce Owen, the NFL's damages expert, about testimony he gave in unrelated cases. In the cases in question, *Buffalo Broadcasting Co. v. American Society of Composers, Authors & Publishers,* 546 F.Supp. 274, 293 n. 42 (S.D.N.Y.1982) (rejecting testimony of defendant's expert Owen, in part because he had testified as government economist that ASCAP was anticompetitive cartel), *rev'd,* 744 F.2d 917 (2d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985), and *Southern Pacific Communications Co. v. AT & T Co.,* 556 F.Supp. 825, 913 (D.D.C.1982) (rejecting testimony of plaintiff's expert Owen, in part because of role as government economist favoring AT & T break-up), *aff'd,* 740 F.2d 980, 740 F.2d 1011 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985), Dr. Owen's testimony was rejected by the district court but vindicated on appeal. *See Buffalo Broadcasting,* 744 F.2d at 931–33 & n. 12; *Southern Pacific,* 740 F.2d at 1000–02. It was well within Judge Leisure's discretion to avoid a confusing and certainly complex digression into two earlier trials and appeals. *See Bari,* 750 F.2d at 1178–79. We note that such a digression is not required by *Walker v. Firestone Tire & Rubber Co.,* 412 F.2d 60, 63–64 (2d Cir.1969), in which the expert in question had given extremely contradictory testimony regarding his qualifications in an earlier unrelated trial. Probing into the qualifications of an expert is a far cry from probing into differing judicial reactions to Owen's prior testimony in totally unrelated cases.

■ Moreover, the record does not support the USFL claim that the district court allowed the NFL to challenge the USFL's damages case unfairly. Fed.R.Evid. 104(a) permits voir dire of an expert witness, where, as here, an expert's testimony involved two industries, professional football and television, and various complex economic models and assumptions. The district court also properly allowed the NFL to question Dr. Cornell about the effect of injunctive relief on the USFL's damages, namely "what effect, if any, ... a cessation of illegal conduct by defendants would have on plaintiffs' future." This cross-examination did no more than probe Dr. Cornell's direct testimony that future damages were appropriate because the USFL would suffer damage "as long as the particular behavior complained about ... continues."

#### e. Miscellaneous Evidentiary Claims

■ We briefly address the USFL's remaining evidentiary claims. The record contradicts the USFL's claim that it was not permitted to examine New York Jets' owner Leon Hess about his alleged conflict of interest as an NFL owner and ABC director and about statements made by Senator D'Amato and Vincent Tese. The district court also acted within its discretion when it excluded a letter to Hess from Mayor Edward Koch regarding the return of the Jets to New York City, even though Hess's reply was admitted. The Koch letter was excluded on the grounds that it was both hearsay and unduly prejudicial under Rule 403. The doctrine of completeness, Fed.R.Evid. 106, does not compel ad-

mission of otherwise inadmissible hearsay evidence. *See United States v. Terry,* 702 F.2d 299, 314 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

Judge Leisure also properly excluded a 1982 letter from the Senate Judiciary Committee to Roone Arledge of ABC regarding sportscaster Howard Cosell's testimony on legislation concerning sports franchise relocation. The USFL claimed that Arledge, at Rozelle's request, had sought to reschedule Cosell's testimony in order to increase the likelihood that the bill would be voted out of committee before Congress adjourned. However, the USFL failed to establish a sufficient foundation for the admission of this letter under the public record exception of Fed.R.Evid. 803(8).

 In addition, the USFL claims that an exchange of letters in 1970 between then ABC President Leonard Goldenstein and the president of an earlier United States Football League, which never fielded any teams, was improperly excluded from evidence. In his reply, Goldenstein had stated that ABC was not interested in televising another league because it had just signed an NFL contract for Monday Night Football. The USFL hoped to show by this evidence that the NFL's television contracts prevented the networks from broadcasting another league. Judge Leisure, however, acted within his discretion in concluding that the NFL would be unduly prejudiced under Fed.R.Evid. 403 by the admission of these letters and that a proper foundation for this hearsay evidence had not been established pursuant to Fed. R.Evid. 803(6). On the other hand, he did admit evidence relating to the WFL's futile attempts to obtain television contracts after Rozelle had testified that he told CBS officials of his "surprise" that Robert Wussler, president of CBS Sports, had attended a meeting with the WFL.

 The district court also excluded testimony by Ed Garvey, former head of the NFL Players Association, regarding ABC's unwillingness, without NFL approval, to consider broadcasting touch football games during the halftime of NFL games.

Such testimony was clearly irrelevant and misleading with respect to any alleged television conduct by the NFL because it had nothing to do with the USFL or NFL control over the networks. Instead it concerned the production only of NFL games.

 Finally, we consider the USFL's attempt to impeach Tex Schramm of the Dallas Cowboys by showing that his testimony that the unionization of the USFL was never discussed at NFL meetings was false. First, no foundation was laid to introduce handwritten notes of an NFL official allegedly reflecting the comments of an NFL players union official at an NFL meeting. Second, these notes were, as Judge Leisure found, being offered for their truth, not simply for the fact that the statements were made, and were properly excluded as multiple hearsay under Fed.R. Evid. 805.

### 3. *The District Court's Damages Instructions*

The USFL contends that it received an award of only $1.00 because of incorrect jury instructions regarding damages. Again, we disagree. Specifically, the USFL challenges the instructions with respect to an antitrust plaintiff's burden of proving the amount of damages and with respect to nominal damages.

#### a. The $1.00 Award

 The jury was given the following nominal damages instruction:

Just because you have found the fact of some damage resulting from a given unlawful act, that does not mean that you are required to award a dollar amount of damages resulting from that act. You may find, for example, that you are unable to compute the monetary damages resulting from the wrongful act, except by engaging in speculation or guessing, or you find that you cannot separate out the amount of the losses caused by the wrongful act from the amount caused by other factors, including perfectly lawful competitive acts and including business decisions made by the

type header omitted

plaintiffs or the plaintiffs' own misman-agement. Or you may find that plain-tiffs failed to prove an amount of dam-ages.

You may decline to award damages under such circumstances, or you may award a nominal amount, say $1.

The jury's $1.00 award was consistent with this instruction. The NFL offered much evidence of self-destructive USFL de-cisions, and the jury's nominal award sug-gests that it credited this proof, as it was free to do. Moreover, it is now clear that Dr. Cornell's testimony was based on a number of assumptions entailing legal premises that were incorrect or factual con-clusions that were rejected by the jury. In awarding only nominal damages, the jury might reasonably have concluded that the USFL had failed to prove any damages.

b. Nominal Damages in Antitrust Cases

■ We also reject the USFL's claim that the award of nominal damages in anti-trust cases is somehow "suspect." Other courts routinely approve the award of such damages, *see, e.g., Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n,* 666 F.2d 1130, 1147 (8th Cir.1981), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982), and the USFL cites no authority holding that nominal damages are impermissible in an antitrust case. It is true that we questioned the award of nominal damages in dictum, *Herman Schwabe, Inc. v. United Shoe Mach. Corp.,* 297 F.2d 906, 909 n. 4 (2d Cir.) ("possibility of awarding nominal damages under § 4 of the Clayton Act ... seems dubious in light of the language of the statute and the Supreme Court opinions"), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). However, our observations were made in the context of a directed verdict based on the plaintiff's failure to prove damages. The USFL's reliance upon *Schwabe* is, as the district court noted, "remarkably ironic" because the rationale of *Schwabe* would deny the USFL any damages at all. *Opinion No. 16,* 644 F.Supp. at 1053.

c. Proof of Antitrust Injury and Damages

■ We next consider whether the dis-trict court properly instructed the jury with respect to an antitrust plaintiff's burden of proving the amount of damages. To recov-er treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), an anti-trust plaintiff must prove that its injury was, in fact, caused by the defendant's violation of the antitrust laws. *Argus,* 801 F.2d at 41; *MCI Communications,* 708 F.2d at 1161.

Judge Leisure instructed the jury as fol-lows with respect to injury causation:

[P]laintiffs do not have to prove that the unlawful activity that the defendants al-legedly engaged in was the sole cause of their injuries. Plaintiffs meet their bur-den if they show that the defendants' unlawful facts substantially contributed to their injuries, even though other facts may have contributed significantly. An antitrust plaintiff is not required to show that the defendants' acts were a greater cause of the injury than other factors. Plaintiffs need only show that their inju-ry to *some* degree resulted from defend-ants' violation.

(emphasis added). The USFL understand-ably does not challenge this instruction, which was consistent with established precedent. *See Zenith Radio Corp. v. Ha-zeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1572 n. 9, 23 L.Ed.2d 129 (1969); *Litton Sys., Inc. v. AT & T Co.,* 700 F.2d 785, 823 n. 49 (2d Cir.1983), *cert. de-nied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed. 2d 220 (1984). Rather, the USFL chal-lenges Judge Leisure's instruction that the jury could award no damages or one dollar in damages if they found that they could not "separate out the amount of losses caused by [NFL misconduct] from the amount caused by other factors, including perfectly lawful competitive acts and in-cluding business decisions made by the [USFL] or the [USFL's] own mismanage-ment."

■ The USFL claims that this in-struction was incorrect because the NFL should have borne the burden of separating

out the amount of USFL losses caused by the NFL's wrongful acts from the amount caused by other factors such as the USFL's unsuccessful merger strategy. It is true that once proof of injury causation has been established, courts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages. Proof of amount of damages thus need not conform to a particular theory or model, *see Locklin v. Day–Glo Color Corp.*, 429 F.2d 873, 880 (7th Cir.1970) (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971), and exact proof of the amount of damages is not required. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981) (acceptance of "degree of uncertainty" in measure of antitrust damages is necessary because of difficulty of ascertaining "what plaintiff's situation would have been in the absence of the defendant's antitrust violation"). An antitrust plaintiff must thus provide only sufficient evidence to support a "just and reasonable estimate" of damages. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) (proof of antitrust damages sufficient "if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate").[27]

Whatever latitude is afforded antitrust plaintiffs as to proof of damages, however, is limited by the requirement that the damages awarded must be traced to some degree to unlawful acts. *MCI Communications*, 708 F.2d at 1161.[28] That latitude is thus circumscribed by the need for proof of causation. The Supreme Court emphasized this in *Bigelow* by relaxing the standard for proving amount of damages only after "proof of defendant['s] wrongful acts and their tendency to injure plaintiff['s] business, and from the evidence of the decline in prices, profits and values, *not shown to be attributable to other causes*." 327 U.S. at 264, 66 S.Ct. at 579 (emphasis added).

A plaintiff's proof of amount of damages thus must provide the jury with a reasonable basis upon which to estimate

---

**27.** Judge Leisure gave an instruction regarding the USFL's lightened burden of proving the amount of damages that was entirely consistent with these rules. Repeating nearly verbatim the instruction set forth in Judge Sand's *Modern Federal Jury Instructions* ¶ 79.02, at 79–57 (1986) (Instruction 79–26), Judge Leisure instructed the jury as follows:

It might be difficult for you to measure the plaintiff[s'] damages in this case. However, the fact that it might be difficult to determine the amount of the plaintiffs' damages should not prevent you from awarding damages to plaintiffs. The law allows a party injured by conduct which violates the Sherman Act to collect damages even if the evidence does not reflect how those damages are to be calculated with mathematical precision.

This does not mean, however, that you may determine the plaintiff[s'] damages on the basis of mere speculation or guesswork. Rather, you must look to the evidence presented to you and make a fair and reasonable estimate of the plaintiff[s'] damages based on the evidence.

Judge Leisure properly instructed the jury as follows on future damages:

In this case plaintiffs are seeking not only to recover those damages they allege they have already suffered, but also to recover damages they claim they will suffer in the future as a result of the anticompetitive conduct of defendants that has already taken place and which may take place in the future.

With regard to future damages, you are instructed that such damages are not recoverable if you find that the fact of their accrual is speculative or that their amount and nature is unprovable. On the other hand, if you find that you can make a fair and reasonable estimate of plaintiffs' future damages, you may award such damages as you find appropriate, keeping in mind that the damage award need not be calculated with mathematical precision.

**28.** The USFL attempts to distinguish *MCI Communications* on the ground that, unlike the instant case, *MCI Communications* involved partial market foreclosure and thus "special proof problems." Even assuming that the instant case is a total foreclosure case, the Supreme Court stated in *Zenith Radio* that the same standards of proof apply whether there is "a partial or total exclusion from a market." 395 U.S. at 123, 89 S.Ct. at 1576.

the amount of its losses caused by other factors, such as management problems, a general recession or lawful factors. As the Seventh Circuit stated in *MCI Communications:*

> When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage.... To allow otherwise would force a defendant to pay treble damages for conduct that was determined to be entirely lawful.

708 F.2d at 1162–63. In *MCI Communications,* the court overturned a damages award based on a study that did not allow the jury to alter the award to reflect lawful competition from AT & T. *Id.* at 1163; *see Farley Transp. Co. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1352 (9th Cir. 1985) (court reversed jury award because of plaintiff's "utter failure to make any segregation between damages attributable to lawful competition and that attributable to [defendant's] unlawful scheme"); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1353 (3d Cir.1975) ("In the absence of any guidance in the record, we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition."); *Southern Pac. Communications v. AT & T,* 556 F.Supp. at 1090 ("[c]ourt must have a basis for assuring itself that other causes of plaintiffs' injury have been 'filtered out' of the damage claim").

■ The Supreme Court's decisions in *Bigelow* and *Story Parchment* thus do not shift the burden of proving the cause of damages from the plaintiff to the defendant. They simply restate the established principle that where damages have been shown to be attributable to the defendant's wrongful conduct, but are uncertain in amount, the defendant bears the risk of those uncertainties.

*4. The District Court's Denial of Injunctive Relief*

■ Finally, the USFL claims that the district court should have granted sweeping injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 (1982). In particular, the USFL requested membership in the NFL, separation of the NFL into two leagues, each league being limited to one network, or a prohibition on the NFL from broadcasting its games in more than one afternoon time slot on Sunday. Judge Leisure held that the requested relief was unrelated to the monopolization of the market for major-league professional football verdict and not justified by the record as a whole.

The USFL contends that the jury's monopolization verdict compelled the district court to "pry open to competition [the] market that has been closed by defendants' illegal restraints." USFL Br. at 70 (quoting *Zenith Radio,* 395 U.S. at 133, 89 S.Ct. at 1582). However, this argument simply glosses over the critical fact that the jury did not find the NFL liable on any of the USFL's television-related claims. With regard to the findings implied by the monopolization verdict that the NFL engaged in predatory conduct through attempts to co-opt USFL owners, creation of a Supplemental Draft, or expansion in roster size, Judge Leisure denied relief on the ground that the USFL provided no evidence that such conduct was likely to continue or recur. The USFL has not asked us to overturn that denial of relief.

Instead, the USFL seeks sweeping injunctive relief on the ground that the NFL's single league structure, in conjunction with television contracts with the three networks, creates an impenetrable barrier to entry by a competing league into the market of professional football. No matter what the jury found, however, such relief would not have been appropriate. First, Congress has authorized the NFL's single-league structure and its joint economic operations. Second, at the time the district court denied the relief, the NFL's contracts with the networks had expired. There was thus no "tie-up" of the three networks and no barrier to entry created by the "dilution effect." There was only free competition between the NFL's product and the USFL's product. Of course, the district court also properly rejected this claim in

view of the jury's outright rejection of all of the USFL's television-related claims.

What the USFL seeks is essentially a judicial restructuring of major-league professional football to allow it to enter. Because of the explicit congressional authorization in 1966 for the NFL–AFL merger and single-league operation, the USFL does not attack the league structure directly. Instead, the USFL asks us to prevent networks from broadcasting, and fans from watching, NFL games in the hope that they will turn to the USFL. Absent a showing of an unlawful barrier to entry, however, new sports leagues must be prepared to make the investment of time, effort and money that develops interest and fan loyalty and results in an attractive product for the media. The jury in the present case obviously found that patient development of a loyal following among fans and an adherence to an original plan that offered long-run gains were lacking in the USFL. Instead, the USFL quickly changed to a strategy of competition with the NFL in the fall, hoping thereby to force a merger of a few USFL teams into the NFL. That led to a movement of USFL teams out of large television markets and a resultant reduction in value of USFL games to television. As USFL owner and negotiator Einhorn predicted, abandoning major television markets precluded the possibility of obtaining a network contract. The USFL hoped, however, that if a merger did not occur, a jury verdict in the instant litigation followed by a decree effectively forcing a network to televise its product would save the day. Instead, the jury found that the failure of the USFL was not the result of the NFL's television contracts but of its own decision to seek entry into the NFL on the cheap.

## CONCLUSION

For the foregoing reasons, we affirm the jury's verdict and the judgments entered thereon. We thus need not consider the NFL's conditional cross-appeal.

Affirmed.